# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | :: | |
| | :: | |
| **v.** | :: | **CRIMINAL ACTION FILE** |
| | :: | |
| **PHILLIP LAUGHLIN (#1) and** | :: | **NO. 1:10-CR-113-TWT/AJB** |
| **SARAH TOWNSEND (#4),** | :: | |
| | :: | |
| **Defendants.** | :: | |

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION AND ORDER

Before the Court are the following motions: (1) motion to suppress evidence by

Sarah Townsend, [Doc. 171]; (2) motion for return of property (vehicle) by Sarah

Townsend, [Doc. 172]; (3) joint amended motion to suppress statements and searches

by Sarah Townsend and Phillip Laughlin, [Doc. 178]; (4) motion to suppress evidence

improperly allowed to deteriorate by Sarah Townsend and Phillip Laughlin, [Docs. 217,

226]; and (5) motion to allow Sandy Springs Police Department to destroy bulk

marijuana by the United States, [Doc. 188]. After evidentiary hearings, the parties filed

briefs. With briefing concluded, the matters are ripe for disposition. The undersigned

**RECOMMENDS** that the various motions to suppress/return be **DENIED**. Further,

the undersigned **RECOMMENDS** that Defendants' objections to destruction of bulk

marijuana evidence be **OVERRULED**, and that the destruction of bulk evidence be **ALLOWED**.

## I.    Introduction

Defendant Phillip Laughlin and Sarah Townsend are charged with three others with conspiring to manufacture, distribute, and possess with intent to distribute more than 1000 marijuana plants (Count One), manufacturing and possessing with intent to distribute more than 1000 marijuana plants (Count Two), and possessing firearms in furtherance of the drug trafficking crimes alleged in Counts One and Two (Count Three). [Doc. 1].[1] In a pretrial motion to suppress, [Doc. 178], Laughlin and Townsend contended that search warrants issued for and executed at 8130 Habersham Waters Road and 64 Long Island Place were fruits of unlawful warrantless traffic stops and subsequent custodial statements. [*Id.* at 4]. They also contended that the scope of the warrant for 8130 Habersham Waters Road was exceeded by the authorization. [*Id*. at 4-5]. They further contended that the landlord at 64 Long Island Place was an agent of law enforcement and thus engaged in a warrantless search upon

---

[1] The others are Mark Brotemarkle, Derek O'Neal and Jennifer McChan. [Doc. 1]. Brotemarkle and O'Neal were convicted following a trial of Counts One and Two, [Docs. 152, 153]; McChan pleaded guilty to an information charging misprison of a felony in No. 1:11-cr-039-TWT, following which the charges against her in the present case were dismissed on the government's motion. [Doc. 150].

AO 72A
(Rev.8/8
2)

which the search warrant for that location was unconstitutionally based. [*Id.* 5]. They also contended that the search warrant for 1214 Webster Street, top floor, in Oakland California, was invalid. As a result, the Court held evidentiary hearings, [Docs. 200 (hereinafter "T1"); 201 (hereinafter "T2"); and 210 (hereinafter "T3")]. The evidentiary hearings also dealt with the government's request to destroy bulk evidence and Defendants' motion to suppress evidence due to the government's alleged failure to properly maintain the evidence.

## II. Facts

### A. Search of 8130 Habersham Waters Road, Sandy Springs, Georgia; stop and search of Laughlin's automobile and vehicle in which Townsend was a passenger; and post-arrest statements

Personnel of the Sandy Springs, Georgia, Police Department (SSPD) suspected that marijuana was being trafficked out of 8130 Habersham Waters Road in Sandy Springs, Georgia (hereinafter "8130"), as a result of an anonymous tip and police confirmation of marijuana odor emanating from that location. T1:138, 147. SSPD Detective Andrew Spears was directed by his supervisor to call a neighbor who had reported strange activity in the neighborhood. T2:183. The neighbors lived directly across the street from 8130 and reported a strange smell and comings and

3

goings in the middle of the night and provided information on who they believed was living at that address. T2:184.

Using computer databases, Spears learned that Terry Laughlin was the listed homeowner of 8130, that her husband was Lynn Laughlin, and that they had a son named Phillip Laughlin. T2:185. He also learned that "Sarah Townsend also was connected with this group." T2:185. Spears got the tag numbers of vehicles associated with 8130 from the original complainant, and he concluded that a tan Nissan, registered to Georgia McChan, also was associated with this residence. He learned that Georgia McChan had a daughter named Jennifer McChan, and that the daughter was connected to Mark Brotemarkle. T2:185.

In addition to the gold/tan Nissan with a Missouri license plate, law enforcement also associated a black BMW with 8130 after having been given the tag number by the neighbor and seeing it at the location. T1:139; T2:186. Spears was told that the residents were the son of the owner (Terri Laughlin), his (presumably the son's) girlfriend or wife (Sarah), and their child, and that several other white males were seen in and around the residence. Gov't Exh. 1 (search warrant affidavit for 8130) at 2. The complainant also reported bright lights coming from the basement area at night. Spears confirmed that Terri Laughlin owned the house and that her son was Phillip, who had

4

a prior history of VGCSA (violation of the Georgia Controlled Substances Act), manufacturing marijuana, and possession of marijuana. *Id.* Department of Labor records showed no reported income for Phillip Laughlin in two years. *Id.* Spears discovered that Sarah Townsend also was connected to the address and that she had no reported income for 2009 and only $200 for 2008. The power bill was registered to her, and based on Spears's investigations with previous electric bills, the power consumption at the address "appeared to be extremely high." *Id.* at 2; T2:186.

On January 5, 2010, while conducting surveillance at the location, Spears and SSPD Detective Thomas spoke with one of the neighbors. T2:187-88. Spears and Thomas walked down the rode towards 8130 and at the end of the driveway both smelled a strong odor of fresh (unburnt) marijuana, which was particularly striking in light of the very cold temperatures. T2:188; T2:232.[2] They were 120 to 150 feet away from the home. T2:216. The smell dissipated as soon as they moved away from the property. T2:233. The smell was not present in or near the neighbors' houses. Gov't Exh. 1 at 2. The next day, Spears and his supervisor met with the residents immediately next door to 8130, who corroborated what the other neighbors

---

[2]    In Spears's experience, smells are stronger in warm humid weather. T2:188.

AO 72A
(Rev.8/8
2)

were reporting about the smells and the comings and goings. T2:189. These neighbors allowed the police to walk onto their property, which gave the police a view of the back yard at 8130. In so doing, Spears saw the BMW, and noted that its license plate was on crooked. T2:188. He also saw a pile of some indeterminate material covered by a tarp in the driveway, and next to it a jug. T2:188. However, they did not detect any marijuana smell emanating from 8130 from their vantage point. T2:235.

They also spoke to the neighbors on the other side of 8130, who corroborated what the other neighbors stated and in addition stated that every once in a while at night she would see bright lights coming from the basement area in the rear. T2:189; *see also* Gov't Exh. 2 (search warrant application for 64 Long Island Place) at 2. The officers did not smell any marijuana coming from 8130 while they were at this house. T2:235.

On the evening of January 8, 2010, eight SSPD officers engaged in surveillance of 8130. T2:190. One of the neighbors gave the police permission to set up on their property. T2:191. From that property they observed two children and at least one adult inside 8130. T2:192. Police observed people coming and going from inside the house to the black BMW and tan Nissan, and then both vehicles left the residence. T2:193-94.

David Huffschmidt, then an SSPD patrol officer, was one of the officers dispatched to the area of 8130. T1:65. He was in uniform and drove a marked police car. T1:65. His assignment was to wait at the corner of Spalding Drive and Old Dominion Road approximately one mile from 8130 until one of the two vehicles left that location. T1:65-66. Detectives who were surveilling the house told him the BMW had left the address heading west on Spalding Drive. Because Huffschmidt was east of the address, he caught up with the vehicle at Spalding Drive near Roberts Drive. T1:66-67. Huffschmidt was able to read the tag, but saw that the BMW's tag was secured by only one screw and it was dangling from that one screw. T1:67, 84. Huffschmidt waited until there was a safe place to pull the vehicle over and then turned on his blue lights. T1:67; *see also* Gov't Exh. 6 (DVD of traffic stop) at 21:02:30.

The BMW pulled into a parking lot at 8200 Roberts Drive. T1:67. Without instruction from Huffschmidt, the BMW driver opened the driver's side door. T1:67-68; Gov't Exh. 6 at 21:02:46. As Huffschmidt approached the BMW, he immediately smelled a strong odor of fresh, unburnt marijuana coming from it. T1:68, 84. He told the driver, Defendant Laughlin, that he stopped him for improper tag display, and further told him he smelled an odor of marijuana coming from the car. T1:68. Huffschmidt called for backup because he intended on searching the vehicle due to the

7

marijuana smell. T1:68; Gov't Exh. 6 at 21:03-40. He asked Laughlin to step out of the vehicle, and he and Laughlin walked to the rear of the car. T1:68.

Huffschmidt patted down Laughlin and found no weapons, and after asking for his permission to search his person, he also searched his pockets, finding no contraband or weapons. T1:69. Huffschmidt described Laughlin as nervous because he could not stand still and was very talkative. T1:69. Laughlin did not have his driver's license on his person. Gov't Exh. 7 (Transcript of DVD) at 7.

When Sergeant Stevens arrived, Huffschmidt searched the BMW. T1:69. He found a marijuana roach under the driver's side seat, and inside the trunk he found what appeared to be raw marijuana leaves. T1:70. He did not ask Laughlin for consent to search the vehicle. T1:70. Stevens told Huffschmidt that since Laughlin kept walking towards the vehicle while Huffschmidt was searching it, after taking Laughlin's cell phone from him, Stevens put Laughlin in the back of Huffschmidt's patrol car, with no other restraints on him. T1:70-71; Gov't Exh. 6 at 21:12:26. The video reflects that Huffschmidt told Laughlin (in response to Laughlin's question) that he was not under arrest but that he was in the back of the vehicle because Huffschmidt was searching his car and it was cold out. Gov't Exh. 6 at 21:13:35-46.

8

Once he finished searching the vehicle, Huffschmidt joined Stevens and Laughlin in the patrol car. Huffschmidt told him that there was more than that small amount of marijuana in the vehicle, given such a smell. Gov't Exh. 6 at 21:14:52. Laughlin told him that he wanted to be truthful, and without being questioned, Laughlin stated that his girlfriend smoked "really good" marijuana. T1:73; Gov't Exh. 6 at 21:15:27. Laughlin was exceptionally talkative. Gov't Exh. 6 at 21:16:00 to 21:20:15. He was asked about his driver's license (it was lost) and the last time he smoked marijuana. *Id.* at 21:20:16-21:20-46. He was then asked what was at his house, and whether there was anything at his house the police needed to know about. *Id.* at 21:22:15-21:22:23.

Thereafter, the following conversation took place between Laughlin, Huffschmidt and Stevens:

Laughlin:          Are you arresting me sir?

Stevens:           No, we're gonna read you your Miranda. [unintelligible] have you ever been read your rights before?

Laughlin:          Yea, so I mean are you arresting me though?

Stevens:           No, I'm gonna question you though.

Laughlin:          Okay are you -

Stevens:           Don't say I'm not going to arrest you -

9

| | |
|---|---|
| Laughlin: | Are you gonna question me here or are we gonna go and |
| Stevens: | Listen to me, if you were just going straight to jail right now you'd have handcuffs on. |
| Laughlin: | Okay. |
| Stevens: | Okay, I wanna talk to you. You wanna talk to me? |
| Laughlin: | Yes, I would love to talk to you. |
| Stevens: | Okay well I'm gonna read your rights okay and then after you acknowledged that you understand your rights and want to talk to me then *we'll talk and we'll work something out and you don't have to go to jail tonight. Okay there's nothing that says you're going to jail so don't freak out.* |
| Laughlin: | Okay, alright. |
| Huffschmidt: | Alright, listen to me, alright, you listening to me? |
| Laughlin: | Yea. |
| Huffschmidt: | Okay you have the right to - - you have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to lawyer and have them present with you while you are being questioned. If you cannot afford a lawyer one will be appointed or provided to you from the government. You have the right to talk to a lawyer and have him present with you while you're being questioned okay, you understand that right? |

AO 72A
(Rev.8/8
2)

| | |
|---|---|
| Laughlin: | Uh-mm. |
| Huffschmidt: | I need a yes. |
| Laughlin: | Yes sir. |
| Huffschmidt: | Okay and you have the right to speak to an attorney and have an attorney present during questioning. Do you understand that? |
| Laughlin: | Yes sir. |
| Huffschmidt: | Okay so you understand these rights as I read them to you? |
| Laughlin: | Yes sir. |
| Huffschmidt: | Okay cool - |

Gov't Exh. 7 at 12-14 (emphasis supplied); *see also id.* at 15 ("Laughlin: Could you not arrest me and ruin my kid[']s life.; Stevens: . . . It all depends whether you're going to cooperate with me.").

Stevens then told Laughlin that he was getting a search warrant for his house, after which the following discussion ensued:

| | |
|---|---|
| Laughlin: | Right now? |
| Stevens: | Right now. |
| Laughlin: | Can I call my lawyer, I have his number [unintelligible] |

11

Stevens:     I'm getting a search [unintelligible]

Laughlin:    [unintelligible]

Stevens:     You can get a lawyer but I'm getting a [unintelligible]. Hold, hold, hold on.

Laughlin:    [unintelligible]

Stevens:     So you're done talking to me?

Laughlin:    No, I'm not done talking to you. I just would like to notify my lawyer in case you have to bring me anywhere [unintelligible].

Stevens:     Let me get this straight. Do you want to talk to me or not?

Laughlin:    Yes. I do. I don't, I don't need my lawyer to be present or anything like that, if you don't mind.

Stevens:     Here, what I want to talk to you about. . [sic]

Laughlin:    Okay.

Stevens:     If you want to talk to your lawyer, we're over. I'm just gonna get the paperwork and we're done.

Laughlin:    Is Andrew okay?

Stevens:     I'm not talking about Andrew right now. I'm talking about you and your house and what's in your house, okay? And I'm gonna talk about what's in your car.

Laughlin:    Uh, huh.

12

Stevens:      Okay?

Laughlin:     Alright.

Stevens:      Here's the deal.  I got enough in that car to get a search warrant for your house.

Laughlin:     Okay.

Stevens:      Do you stay at Habersham?

Laughlin:     I have a question for you.  What do you want from me? Do, do, do you want to arrest me?  Do you want to arrest me?

Stevens:      I'm about to end this conversation and you're not going to have an option about what's going to happen.

Laughlin:     Okay.  Sir, I, I just want to

Stevens:      I want, I want you to understand completely that you're not in control here, I am.  This is when

Laughlin:     Okay.

Stevens:      You cooperate or not.

Laughlin:     Okay.

Stevens:      Okay.

Laughlin:     Okay.

Stevens:      I've read you your Miranda.  Do you want a lawyer or do you not?

13

|          |                                                                 |
|----------|-----------------------------------------------------------------|
| Laughlin: | Ummm.                                                          |
| Stevens:  | That's solely up to you.                                       |
| Laughlin: | No, but look. We can go there right now, me and you and talk about all this. And do it without having my door kicked in and my kid disturbed and all that. I'm just trying to be human about this. Will you be human with me? |

Gov't Exh. 7 at 15-17.

Thereafter, Laughlin admitted that his vehicle was a decoy ("my tag is on crooked for a reason") for the "whole load [that] just went down the damn street." *Id.* at 19. Then, while the officers were outside of the patrol vehicle, Laughlin retrieved his cell phone and instructed the person on the other end to clean out the house. *Id.* at 24; Gov't Exh. 6 at 21:37:35-21:38:13.

Meanwhile, SSPD Detective Jeffrey Byrd began the evening of January 8, 2010, sitting in his unmarked police vehicle, on a side street south of and facing 8130, awaiting orders. T1:138. He was dressed in plain clothes, with his badge hanging around his neck. T3:261, 267. He was to announce by radio if any of the vehicles associated with the residence left and to follow any vehicles that did. When the vehicles left at the same time in tandem, Byrd followed both of them until Huffschmidt pulled over the BMW. T1:139.

14

Byrd continued following the Nissan until it stopped at a gas station at the corner of Northridge and Roswell Roads. T1:139. Byrd observed two males, Brotemarkle and O'Neal, get out of the vehicle and go in and out of the store at that location. T1:139-140; T2:195. Byrd was relieved of surveillance by Detectives Spears and Thomas. T1:139-140. He drove east on Northridge and pulled over to wait until the Nissan left the store, but after the Nissan left, the officers lost it in traffic, so Byrd went back to the vicinity of 8130 to wait for a search warrant. T1:140; T2:195. Within 10 minutes of losing sight of the Nissan, Spears also returned to conduct surveillance of 8130 and began writing a search warrant application on his laptop. T2:197, 218. He was receiving communications from Huffschmidt about the stop of the BMW, including that Laughlin was the driver, that Huffschmidt located leaves in the BMW, that he believed that Laughlin had made a phone call, and that Laughlin was trying to convince them to go to another location rather than 8130 on the grounds that the drugs were in the tan Nissan. T2:197. Huffschmidt also stated that Laughlin told him that the people in the tan Nissan were known to carry weapons and that there was marijuana in 8130 in "a vegetative state." T2:198.

Meanwhile, two other SSPD officers were in a neighbor's yard, and they reported to Spears that people were running throughout 8130 and turning off all the

15

lights. Spears saw the lights go out and saw children and at least one adult female running from the residence, and then he saw the tan Nissan pull away. T2:198-200. The persons who got into the Nissan were not observed carrying anything. T2:218-19.

Thereafter, Byrd heard Spears over the radio stating that the same Nissan was leaving the Habersham Waters address. T1:140; *see also* T2:200. As Byrd began following the Nissan, he heard Thomas state over the radio that individuals were coming out of 8130 and hiding things, and that they ran from him when he identified himself as a police officer. T1:141; T3:263; *see also* T2:200-01 (Spears testifying that he received information either from Thomas or SSPD Detective Bohannon that two males were coming out of the house towards the gazebo in the back, and a few seconds later were observed running towards the front of the house, with Thomas reporting that one of the males appeared to be carrying a metal object that looked like a firearm); Gov't Exh. 1 (recounting that Thomas observed two subjects exit the rear of 8130 carrying large book bags, with one of the subjects hiding them in the gazebo and the other walking into the wooded area behind the gazebo; when Thomas identified himself, one of the subjects dropped an item that looked like a firearm and they fled on foot). By this time, Byrd was aware that Laughlin had been stopped by Huffschmidt and had stated that there had been drugs in the Nissan. T1:141.

16

Spears observed the two males running from the area of 8130 and stopped them.[3]

The individuals, Brotemarkle and O'Neal, smelled strongly of marijuana. T2:201.

Byrd followed the Nissan as it took a circuitous route through a subdivision before turning into a shopping center parking lot, where it made almost a complete circle around the almost completely empty parking lot before pulling into a parking spot in the middle of the lot. T1:142; T3:255, 265. Byrd made eye contact with the female driver. To him, this manner of driving was indicative of a "heat check" to discover if police were following. T2:202.[4] Byrd parked approximately 10 to 12 spaces away from the Nissan, or about 25 to 50 feet away. T3:256. He exited his vehicle, drew his weapon, and approached the Nissan. T3:255-56. He may have had a flashlight in his other hand. T3:266. As he walked over to the Nissan, he identified

_____

[3]      Byrd also was made aware of the foot chase. T3:263-64.

[4]      As Byrd testified:

They conducted a heat check, which is when a drug trafficker will drive in an out-of-the-way manner to flush out anyone who is following them to make it obvious that the person is following them if they take unexpected turns through subdivisions and neighborhoods or they just pull over and stop. That's what it appeared they were doing to me. They had no other reason to drive this very large circuitous route through the Old Dominion subdivision.

T3:264.

17

AO 72A
(Rev.8/8
2)

himself as a police officer in a loud voice and told the occupants to keep their hands visible. T1:142; T3:255, 281. As he arrived at the driver's side window, he saw no immediate danger and observed no firearms in the occupants' hands. Byrd re-holstered his firearm. T3:255-56. His weapon was brandished no more than 10 seconds. T3:256.

Either before or after he re-holstered his firearm, Byrd told the driver, identified as Jennifer McChan, to lower her window. T3:256. There were two adults in the vehicle—McChan the driver and Townsend the passenger—and in the back seat, a small baby in a car seat and a 7-to-8 year old girl. T1:142.[5] Byrd asked for their identification. T1:142-43; T3:269. He asked what she was doing there, and she said they were getting milk for the baby. T3:269-70, 273. He asked her where she had come from and, when she replied the house on Habersham Waters, he asked whether there were any people still in the house she left. T3:269, 270. McChan stated she did not know. T1:143; T3:270. Most of his discussion was with McChan. T3:270. He asked the adults if they had any drugs, weapons, or large quantities of money on them,

---

[5]     Byrd reported to Spears that the occupants stated they were going to Kroger to buy food, which he found odd because the infant had on only a diaper and a jacket. T2:203.

and McChan stated that she had $100, to which Byrd responded that he was not concerned about that.  T1:143.

Officer Johnson, an SSPD uniformed officer, arrived on the scene.  T1:143.  In a conversational tone, Byrd asked McChan for consent to search the vehicle, which he received.  T1:143, 150-51; T3:257-58, 281.  Byrd asked them to step out of the vehicle and he searched it.  T1:144; T3:258, 271.  They stood outside the vehicle with Johnson while the vehicle was searched.  T1:144.  The only relevant item in the Nissan was a large ballast generator commonly used to power marijuana grow lights, which Byrd located in the trunk.  T1:144; T3:258.  Neither McChan nor Townsend responded to his questions about what the item was.  T1:144.  Byrd reported his findings to Stevens, his supervisor.  T3:258.  The search lasted five minutes.  T3:276.  Because it was so cold out, Byrd then had the Nissan's occupants get back in the vehicle, and he called his supervisor for instructions.  T3:276.

Stevens directed Byrd and Johnson to bring everybody back to the Habersham Waters residence.  T1:144.  McChan helped Byrd install the car seat in the back of his vehicle, since he was going to transport the children.  T1:145.  Since McChan and Townsend would be taken in Johnson's vehicle, Johnson told the women that before he put them in his police car, he needed to make sure they were not in possession of

19

anything he needed to know about. T1:145. Byrd testified that it was a common practice for officers to ask persons who are going to be placed in the back of their vehicles to ask whether they have any dangerous item on them. T1:145-46. He further testified that this is particularly true if the officer is male and the passenger female, because the officer usually would not conduct a thorough search on the roadside of a female detainee. T1:146. In response, Townsend reached into her jacket and pulled out currency, and stated, "Just this." T1:145. The currency totaled approximately $21,000. Byrd took it from her stating that he would hold it, but Townsend asked that he not take it because it was her school money. T1:145. McChan and Townsend were handcuffed and placed in the rear of Johnson's car. T1:144-45.

Spears applied for and received a search warrant for 8130 and the curtilage including the gazebo on January 9, 2010, at 12:24 a.m. Gov't Exh. 1. In executing the search warrant, police discovered that the basement of 8130 had been converted into a growing area for marijuana and that the master bedroom was used as a processing area. All of the basement walls, windows, doors, and ceiling were covered with plastic that was different on both sides (the interior was reflective and the exterior, as viewed

from outside, was black.  A ventilation system had been constructed to vent to the rear of the house.  Gov't Exh. 2 at 2.[6]

B.      *Search of 64 Long Island Place, Sandy Springs, Georgia*

On September 14, 2009, Michael Shane Stitcher entered into a lease and lease purchase agreement for 64 Long Island Place, Sandy Springs, Georgia, on behalf of his mother, Donna Stitcher, the owner.  The house was a ranch-style building with a basement and a built-on in-law suite to the right and an added living room to the left. T1:44, 47.  The lessee/purchaser was Lynn Laughlin, who stated to Michael Stitcher that his son and son's baby also would live there, although Stitcher only met and dealt with Lynn Laughlin.  T1:34-36; Gov't Exhs. 4, 5.  The lease term was to begin October 1, 2009.  T1:35.  Lynn Laughlin told Stitcher that the house was perfect for his situation because he would be traveling a lot so that he would live in the in-law suite and his son would live in the main part of the house.  T1:36.

During the search by warrant of 8130, Spears located in the master bedroom a copy of the lease for the property at Long Island Place.  T1:158.  The next week, Spears was told by SSPD Detective Joe Simone that another investigation was taking place in

_____

[6]      In the government's post-hearing brief, it states that 853 marijuana plants were found inside 8130, and in the backyard, police located four firearms and fresh marijuana packaged for sale.  [Doc. 211 at 17 n.2].

AO 72A
(Rev.8/8
2)

the Long Island Place neighborhood very early in the morning, and that investigators could smell a strong odor of marijuana from the house while they were out in the street. T1:158-59. Spears headed over to that location, arriving at about 9:30-10:00 a.m. T1:159. Other officers were standing in front of the house in the street. T1:159. Spears knocked on the neighbors' doors, and the neighbors gave him access to walk onto their property in order to better view the suspect property. T1:162. He saw that all of the windows were covered with a solid black covering. T1:163. From the neighbor's house on the left he saw plywood over a window in the rear into some sort of vent system similar to the one seen at 8130. T1:163. From the street, he saw water pouring out of the side of the house. T1:163.

As a result of what Simone observed, Spears directed that the homeowner be called. T1:165. Michael Stitcher was called by Simone, who asked him if he owned or leased the house. T1:37, 42. When Stitcher stated he rented the location, Simone asked him what kind of tenants he had. Stitcher described Lynn Laughlin as a "Ward Cleaver-type," since he was in his 60's and clean cut, and asked Simone why he was asking. Simone asked him to come to the location because of water leaking out of the side of the house. T1:37, 42, 56-57.

22

Stitcher arrived at the house about one half-hour later. T1:42. Stitcher got out of his car and met the police officers who were in the street. T1:62-63. Simone and Spears introduced themselves, and they crossed the front lawn and the driveway to get to the right side of the house where the leak was coming from. T1:63, 166. Spears told Stitcher that they had executed a search warrant for a marijuana grow house at another location. T1:166. Although the water leak was probably not visible from the street, Stitcher and Simone walked onto the property, where Simone showed him the water leak at the side of the house. T1:42-43, 57-58. The leak could be observed from 20 to 30 feet away. T1:43. The ground was very saturated. T1:43. Stitcher saw water flowing out of the side of the house ("like a creek . . . not a river") between the in-law suite and the back living room fireplace, and the water appeared to be coming from the kitchenette area of the first floor. T1:37, 38, 42, 44. He observed plastic on the inside of all of the windows, and he could detect a faint smell of growing marijuana. T1:45-46; *see also* T1:166. He was concerned over damage to the house, and therefore he called Lynn Laughlin on his cell phone, but Laughlin did not answer. T1:37-38, 167. Stitcher left a message stating that there was water leak at the house and that he would have to get into the home immediately. T1:38. The lease granted the landlord the right

23

to "enter Premises or Property at any time to protect life and prevent damage to Premises and Property."  Gov't Exh. 5, ¶ 16; T1:38.

Although Stitcher knew that "there was something going on because [the police] wouldn't be there," he did not want to know, but wanted to enter the house to stop the water leak.  T1:39.  The police did not ask him to enter the home.  T1:39.  Simone told him he did not have to enter the house if he did not want to, but if he wanted to enter the house he could.  T1:40, 60.  Spears also told him that if he went inside, it could not be as an agent of the police but only as to the terms of his lease or his practice with other properties.  T1:166.  Although the police asked him if they could enter, and he gave them permission, the police did not enter, and decided instead to get a warrant.  T1:39, 40, 51, 167.  The locks had been changed on the house, so Stitcher at first could not enter.  T1:40.  He called a neighbor who was a locksmith, who came to the location and after a few minutes was able to open the front door.  T1:39, 47, 53.

As soon as the locksmith unlocked and opened the door, there was a wave of growing marijuana smell.  T1:40, 60.  As Stitcher entered the house, it did not appear to him that anyone had moved in, since there were one or two chairs in the living room and a table with equipment on it in the dining room.  T1:48. Although worried about what he observed and smelled and the potential for booby traps or protection dogs,

24

Stitcher continued through the house to check on the water damage. T1:40, 59. He went into the in-law suite (the door was unlocked). T1:48. There he saw bags of soil and other items, including small plants, which he assumed were marijuana plants. T1:49. He discovered the leak was not in the in-law suite but in the crawl space. T1:40, 49. He went to the basement in order to turn off the water. T1:50. On his way to the basement, he observed HVAC pipe laying on the floor coming up the stairs. The basement was walled off by plastic, which he had to go through, and once through it, he saw approximately 300 5' foot marijuana plants. T1:50. He could not get to the water turn off, so he went to a neighbor's house, got a water key, and turned off the water from the street. T1:50. Based on the bad condition the house was in after only 4 1/2 months, including the fact that there was mold on the walls and ceilings, trash and damaged Sheetrock, Stitcher inspected every room. T1:54. Stitcher found in each room—but particularly the basement—growing marijuana plants in different stages of maturity, HVAC pipes attached to motors controlling airflow, grow lights, plastic on the walls, and a water filtration system. T1:40-41. Upon exiting the house, Stitcher reported his observations to the police, who were congregated at the end of the

25

driveway. T1:41, 167.[7] Spears obtained a search warrant for the location at 1:00 p.m. that day. Gov't Exh. 2.

> C.  *March 11, 2011, search of 1214 Webster Street, top floor, in Oakland, California*

On March 16, 2011, the Superior Court of Alameda County, California, issued a search warrant for 1214 Webster Street, top floor, in Oakland, California. Gov't Exh. 3 at 1. The affiant, Oakland Police Officer Jose Vazquez, had been a police officer for 12 years, had received 40 hours of training in marijuana cultivation, packaging, and sales, and had participated in over 100 narcotics arrests. *Id.* at 3. In his affidavit in support of the search warrant, Vazquez averred that on March 8, 2011, he received an email from the Chief of Police's office concerning the presence in Oakland of two fugitives from the Atlanta, Georgia, area who were wanted for large-scale marijuana cultivation and weapons charges. He noted that the charges had "gone federal" and that the bail was $150,000. The tipster also provided that the fugitives had 60-80 marijuana plants at the location, two pit bulls, and possibly weapons. The tipster only gave the fugitives' first names and did not provide their ages or a physical description. *Id.* at 3; *see also* T1:101.

---

[7]     After the police executed the search warrant, Stitcher returned to the house to fix the cause of the leak, which had resulted from a frozen water pipe. T1:55.

AO 72A
(Rev.8/8
2)

Less than two hours after receiving the email containing the tip, Vazquez and his partner, Officer Wong, went to the location and saw a UPS delivery truck in front of the address, where it appeared to be making a delivery to an unknown male. In walking past the address as soon as the truck left, Vazquez and Wong smelled fresh uncut marijuana when they got within 30 to 40 feet of the location. There were no other persons in the area, and the smell disappeared as soon as they passed the address. As they left in their own vehicle, the officers saw a white male and female at the curb in front of the location next to a silver 2002 Subaru SUV which came back registered to "Sebastion Ages" at 972 43rd Street in Oakland. The male was 5'9", had a thin build and full beard, and was wearing sunglasses and a men's Ivy League cap, while the female appeared to be 5'4" and pregnant. A large fawn and white pit bull was seen in the Subaru. "It appeared the two individuals entered 1214 Webster Street top floor. . . ." Gov't Exh. 3 at 3. However, at the evidentiary hearing, Vazquez testified that he only assumed these persons went to the top floor in order to corroborate what the tipster had stated even though he had not witnessed them going to that floor. T1:123-24.

After an unsuccessful effort to obtain information about the fugitives, on March 15, 2011, Vazquez spoke with SSPD narcotics detective Andrew Spears, who

identified the fugitives as Defendants with their dates of birth and Georgia driver's license numbers. Gov't Exh. 3 at 4. He then confirmed that there were outstanding warrants against them, as well as their criminal histories in the Atlanta area, which included furnishing alcohol, drug trafficking, and possession of a firearm or knife during the commission of a felony. *Id.* Upon receiving the information from Sandy Springs, however, Vazquez knew that Laughlin was not 5'9", that Townsend was not a 5'4" pregnant female, and that they were not associated with a Subaru. T1:122.[8] However, Vazquez did not know if they were associated with Sebastian Ages. *Id.*

The next day, Vazquez spoke to a Deputy U.S. Marshal in San Francisco, who had been assigned to track down Defendants. He reported that a confidential informant of the Marshals in Texas had provided information that Laughlin and Townsend had fled to the San Francisco area because Laughlin had a sister in San Francisco, and they were cultivating marijuana in the area in order to raise enough money to flee the country. Gov't Exh. 3 at 3. Vazquez continued that

> Based on your Affiant[']s observations of the suspects in front of the location and the photos of the wanted Georgia suspects I believe they are one and the same. In addition, based on your Affiant['s] training and experience and observations of the location, the previous arrests

---

[8]     Vazquez's explanation for not including updated information in the warrant application was "what I wrote is what I wrote." T1:123.

> Marijuana case being charged in Georgia and the tip your Affiant believes there to be Marijuana cultivation inside 1214 Webster Street top floor Oakland, CA 94612 and arrest the warranted suspects and seize evidence.

*Id.* Vazquez also stated that in his training and experience it was common for marijuana sellers to use aliases or nicknames to conceal their true identities from police. *Id.*

At the evidentiary hearing, Vazquez testified further that the Oakland Police Department received an anonymous tip that two individuals, with first names "Phillip" and "Sarah," were fugitives from Georgia and currently in Oakland at 1214 Webster Street. T1:91.[9] Vazquez, who at the time was assigned to the FBI's Safe Streets Fugitive Gang Task Force, was detailed to check out the tip. T1:92. He called the SSPD, who ultimately advised him that the two fugitives were wanted on drug and weapons charges and had been fugitives for about one year. T1:93. He received from the SSPD Defendants' names, dates of birth, history of their case, Georgia driver's licenses, and photographs. T1:130. Laughlin's height was listed as approximately 6'5" and Townsend's was perhaps 5'2". T1:131. He did not attempt to find Sebastian Ages's driver's license photograph. T1:131.

---

[9] The tip may have originated in Sandy Springs. T1:121.

AO 72A
(Rev.8/8
2)

Vazquez and his partner went to the area and walked down the street to find "1214" and saw that the building at that address was the Dietiz Building. T1:95. As he walked by, they smelled a strong odor of fresh uncut marijuana, which disappeared as soon as they passed that address. T1:96. The anonymous tipster also had stated that a marijuana grow house with 60 to 80 plants, and dogs and guns, was located on the top (third) floor of the three-story building. T1:96-97.

1214 Webster Street Building was a three story cinder block commercial building. Gov't Exh. 3 at 2. Upon entering the building through the front door, a stairway leads both upstairs and downstairs. T1:109. The down staircase led to a door on the left, but Vazquez did not know what was behind that doorway. T1:109-110. The up staircase went up two floors. T1:110. On the second floor was a doorway to the left, but Vazquez did not know what was behind that door either. T1:110. On the third floor, there was a long hallway that led to an apartment unit on the right. T1:110, 126. Vazquez did not know if there was more than one unit on that floor, although there may have been. T1:110. Prior to executing the warrant, Vazquez did not investigate how many units were on the top or third floor of the building. T1:132.

In executing the warrant, police went into the apartment unit to the right on the third floor of the building, which had a closed metal gate but an open door and from

30

which emanated the smell of marijuana. T1:126-27. The police discovered about 300 marijuana plants in various stages of growth. T1:100. Laughlin was apprehended after he jumped out of the window on the 12th Street side of the location. T1:100; Gov't Exhs. 13, 14, 15. The row of windows depicted in Gov't Exh. 13 were all from the same right-hand unit where the marijuana was found. T1:135-36

Vazquez conceded that Laughlin was not the same individual he saw on the curb in front of 1214 Webster Street. T1:103.

### D.    *Preservation of the Seized Marijuana*

Paul Marschalk was with the SSPD as property and evidence coordinator for two years until mid-2011. T3:289. In January 2010, evidence was stored at the department in a 30x30 caged secure area on the first floor of the police headquarters. Narcotics, drugs, and guns were stored in a separate secure compartment within that cage. T3:290-91. There was not a separate place to store live marijuana plants from this internal area. T3:291.

He was told about the discovery of marijuana plants at 8130, and went down to view them in the basement of the residence. T3:292. The plants were bagged up in paper lawn refuse bags—and when those ran out, large plastic bags—and taken to the caged inner storage area. T3:292; *see also* T2:227. Marschalk described the SSPD

AO 72A
(Rev.8/8
2)

policy that wet plant material such as marijuana should be placed in a paper bag so that it can ventilate and prevent molding or decompensation. T3:293.[10] As a result, the plants that were in the plastic bags were removed from those bags and placed in the paper refuse bags. T3:293. Marschalk testified that he did not go to the 64 Long Island Place seizure, but rather that the seized plants were brought to him in similar paper refuse bags, although cardboard boxes were also used to transport and store the marijuana. T2: 229; T3:293.

On January 13, 2010, Marschalk collected ten 10-gram samples of wet marijuana seized from both locations and allowed them to dry in paper bags before being sent to the GBI (Georgia Bureau of Investigation) Crime Lab for analysis. T3:293, 295. He followed the procedure advised by Simone, who was the SSPD contact with the DEA (Drug Enforcement Administration). T3:294. The samples were sent to the crime lab

---

[10] Sandy Springs Police Department General Order 83-102 (03/12/2008) provides in relevant part:

Any wet plant material (such as marijuana plants, leaves, mushrooms, etc.) must be dried before submitting. Place the material in a brown paper bag, folded at the top and stapled with the Property & Evidence Form attached indicating that the material enclosed is wet. The materials will be air dried by the Property and Evidence Coordinator or designated alternate officer before packaging for the crime lab.

Def't Exh. 1 at 8-9.

AO 72A
(Rev.8/8
2)

on March 4, 2010. T3:295. In addition, plant material that already had dried before it was seized also was sent to the lab. T3:296.

Marschalk understood that the remaining plant material was going to be retained until a court order authorizing its destruction could be obtained. T3:297. He received verbal approval to destroy it from a Fulton County District Attorney, but the Fulton County Superior Court Judge to whom the request was made declined to issue the order because the case still was pending. T3:298-99. He also received e-mail authority from another Fulton County Assistant District Attorney to destroy all but 10 pounds of the marijuana, but Marschalk's supervisor stated that the e-mail was insufficient. T3:298-99.

Marschalk was convinced he met a dead end pursuing a destruction order, but at the same time he was receiving complaints about the "overwhelming odor" throughout the entire building. These complaints began the day the plants were brought in, because the ventilation system in the police department's building transmitted the odor throughout the entire building. He was getting headaches from the odor. T3:300. As a result, on January 14, 2010, he began putting the material into large plastic trash bags that could be sealed with twist ties. T3:299, 301. When he did this, he wore latex gloves, a face mask and protective clothing because the odor was overwhelming.

33

T3:301. Also, in reaching into the bags to remove the plants, he discovered a white mold consistent with aspergillus from the heat and decomposition. T3:301.[11] Also, liquid from the material was starting to leak through the bottom of the paper bags. T3:301-02. His hope was that by sealing the material in plastic, the mold spores would not be getting into the air. T3:302.

The plants were stored in that fashion for three weeks, but he was still getting complaints about the odor and he still had headaches. T3:302.[12] As a result, a

_____

[11] Although Marschalk testified that aspergillus was a carcinogen, T3:302, the Centers for Disease Control defines it as a fungus that is common in the environment. It is found in soil, on plants, and in decaying organic matter. It is also found in household dust and building materials. There are many different species of Aspergillus, but the most common species are *Aspergillus fumigatus* and *Aspergillus flavus*. Other species are *Aspergillus terreus*, *Aspergillus nidulans*, and *Aspergillus niger*.

Aspergillosis is an infection caused by a fungus called Aspergillus. There are several different kinds of aspergillosis. One kind is allergic bronchopulmonary aspergillosis (also called ABPA), a condition where the fungus causes allergic respiratory symptoms, such as wheezing and coughing, but does not actually invade and destroy tissue in the body. Another kind of aspergillosis is invasive aspergillosis, a disease that usually affects people with weakened immune systems. In this condition, the fungus invades and damages tissues in the body. Invasive aspergillosis most commonly affects the lungs, but Aspergillus can spread throughout the body and also cause infection in other organs. CDC Website, http://www.cdc.gov/fungal/aspergillosis/definition.html (last visited June 27, 2012).

[12] He did not seek medical treatment for the headaches. T3:320.

corrugated steel container was ordered and delivered on February 4, 2010, which removed the source of the mold from the building where employees and the public could come into contact with it. T3:303. The plant material was placed in plastic garbage bags, then placed inside plastic garbage cans, which were them sealed with duct tape. The cans were then put into the storage unit. T3:304-05.

Marschalk recognized that the material would decompose, but the department was not equipped to handle that volume of marijuana (1100 plants) without cordoning off the parking lot and laying out the material in hopefully dry weather. T3:303, 315. He expected to get a destruction order, but he left his job in July 2010 . T3:304. The material was stored there for one to three months, but the smell was becoming overwhelming, so the department asked the DEA what to do with the material. Also, the crime lab technician reported the risk of aspergillus mold on the marijuana, which could harm the persons in the building. Samples were sent to the GBI crime lab for testing. The remaining plant material was stored in a big steel container in the police department's parking lot. T2:230-31. In June 2011, the materials were moved to the department's new property room. T2:231.

AO 72A
(Rev.8/8
2)

## III.  Discussion

### A.  *Issues related to the stops and arrests of Defendants and search of 8130 Habersham Waters Road*

#### 1.  Contentions of the Parties

The government argues that Huffschmidt had probable cause to stop the BMW driven by Laughlin because he observed a violation of O.C.G.A. § 40-2-41 as a result of the BMW license plate being secured by only one screw and dangling.  [Doc. 211 at 22-23].  It then argues that Huffschmidt had probable cause to search the BMW because of the marijuana smell that emanated from the vehicle when Laughlin opened the door.  [*Id.* at 23-24].  Next, it contends that as a result of Huffschmidt's finding a marijuana roach under the driver's seat and fresh marijuana leaves in the trunk, Huffschmidt had probable to detain and arrest Laughlin.  [*Id.* at 24-25].

As to Laughlin's statements, the government contends that they were voluntary in that Stevens's comments about Laughlin not going to jail if he cooperated did not coerce Laughlin into waiving his *Miranda* rights.  [*Id.* at 26-30].  In addition, the government argues that Laughlin did not clearly and unequivocally request an attorney.  [*Id.* at 30-32].  Finally, the government contends that Laughlin's statements were otherwise voluntary.  [*Id.* at 32-34].

36

AO 72A
(Rev.8/8
2)

Next, the government contends that Byrd's seizure of and detention of McChan and Townsend was lawful because it was supported by reasonable suspicion due to (1) the anonymous tip of drug trafficking at 8130, (2) the officers' smelling of marijuana emanating from 8130, (3) Laughlin's statement that the Nissan contained marijuana, and (4) McChan's circuitous driving, which constituted a "heat check." [*Id.* at 34]. It also argues that Townsend lacks standing to challenge the search of the Nissan since she did not own it and was only the passenger. [*Id.* at 35]. Further, the government argues that even if Townsend had standing, McChan voluntarily consented to the search of the Nissan, and the ballast was properly seized. [*Id.* at 35-37].

As to Byrd's seizure of the currency from Townsend, the government argues that although the women were in custody for *Miranda* purposes, the currency nonetheless was lawfully seized because *Miranda* does not require exclusion of physical fruits of an unwarned but voluntary statement, pursuant to *United States v. Patane*, 542 U.S. 630 (2004). [Doc. 211 at 39-40]. Alternatively, the government submits the currency was properly seized under the doctrine of inevitable discovery because, having been placed in Johnson's patrol car and subsequently arrested, the currency would have been discovered during the search incident to lawful arrest. [*Id.* at 40-41]. The government

AO 72A
(Rev.8/8
2)

also argues that the seizure of the currency was lawful because of the public-safety exception, given that Johnson had the authority to ask Townsend about dangerous items before he placed her in the back of her patrol car, and Townsend responded by producing the currency. [*Id.* at 41-43].

The government also argues that even if the search warrant was based on illegally obtained statements from Laughlin or Townsend, the warrant was valid because the items seized as a result of the warrant were physical fruits of un-*Mirandized* but voluntary statements. [*Id.* at 43-45]. Further, the government argues that even without those statements, the search warrant for 8130 was supported by ample probable cause due to the neighbors' complaints, high electricity usage, the strong odor of marijuana coming from 8130 but none from the neighbors' properties, Brotemarkle and O'Neal's running from the residence carrying bags and what appeared to be a firearm and then trying to flee the police, and McChan's "heat check" driving as she and Townsend left the residence. [*Id.* at 45]. Finally, the government argues that the 8130 warrant, if not supported by probable cause, is saved by *Leon* good faith. [*Id.* at 46].

In his response, Laughlin argues that the stop of his automobile was not authorized by O.C.G.A. § 40-2-41, because his tag was neither swinging nor not visible

38

and thus he was in compliance with the Georgia statute. [Doc. 228 at 1-2]. He also

argues that even if he was properly stopped, the search of the trunk was unlawful under

*Arizona v. Gant*, 556 U.S. 332 (2009).

Laughlin next argues that his statements were involuntary because Stevens's

statement to him that "we'll talk and we'll work something out and you don't have to

go to jail tonight . . . there's nothing that says you're going to jail tonight" (quoting

Gov't Exh. 7 at 12, 13), constituted "the purest form of hope of benefit" rendering the

statements involuntary. [Doc. 228 at 2]. He also argues that he invoked his right to

counsel, and thus his statements are subject to suppression. [*Id.*]. As a result, he argues

that the 8130 warrant was tainted by his statement and those of Townsend. [*Id.*]. He

also contends that the officers' statements that they smelled marijuana emanating from

8130 to be incredible and as a result there was insufficient reliable evidence to support

the issuance of the warrant. [*Id.* at 2-3]. Finally he argues that the police impermissibly

entered the property and seized firearms prior to the issuance of the warrant. [*Id.*

(citing T2:200, 214)].

In her response, Townsend argues that *Patane* is distinguishable because in that

case the defendant was being advised of his rights and interrupted the officer by stating

that he knew his rights and then described where the weapon was, as opposed to here,

where there were no *Miranda* warnings and no evidence that she was aware of her right to remain silent. [Doc. 218 at 3]. Townsend also argues that this case involves not just physical evidence but her action and statement in response to a direct questions from Byrd and Johnson as to whether they had any drugs, weapons, or large quantities of cash. [*Id.*]. Townsend further argues that another case relied upon by the government, *United States v. Jackson*, 506 F.3d 1358 (11th Cir. 2007), also is inapposite because the defendant there was subject to a probation search and thus the probation officer did not need permission to search Jackson or his home. [Doc. 218 at 4].

Townsend similarly contends that inevitable discovery does not save the seizure of the currency because there was no evidence that the police were actively pursuing a lawful alternative means of discovery when Johnson questioned her without *Miranda* rights, and in any event there was no probable cause to arrest her. [*Id.* at 5].

Townsend also argues that the public-safety exception to *Miranda* does not protect the encounter from exclusion because Byrd already determined that neither McChan nor Townsend were armed or could place him in danger. [*Id.* at 5-6].

The government replies that Laughlin's argument about his tag should be rejected. It argues that Huffschmidt's use of the term "dangling" is the same as "swinging" and that how Laughlin's tag was displayed—since it was secured by only

40

one screw and dangling—satisfies the statute and thus the stop was justified. [Doc. 234 at 1-2]. It also argues that Laughlin admitted that his tag was on crooked so as to be a decoy. [*Id.* at 2]. The government further argues that even if O.C.G.A. § 40-2-41 did not authorize the stop, Huffschmidt had reasonable suspicion to stop Laughlin's car because of the tips about comings and goings at 8130 and a weird smell reported by the neighbors, Laughlin was a resident at 8130 and his car was one of the vehicles associated with the residence, the electricity usage was excessive, and the officers smelled fresh marijuana outside the residence. [*Id.* at 2-4].

The government next argues that *Arizona v. Gant*, which concerned search incident to arrest, is neither instructive nor controlling here, because Laughlin's car was searched pursuant to the automobile exception, and Huffschmidt had probable cause to search the trunk due to the strong smell of marijuana and the discovery of the marijuana roach in the passenger compartment of the vehicle. [Doc. 234 at 4-5]. The government rested on its arguments in the opening brief. [*Id.* at 5].

As to Townsend's arguments, the government states that the facts of *Patane* and *Jackson* are identical to her case, in that the defendant was in custody and was questioned without *Miranda* warnings, and the answers led to seizure of physical evidence. [Doc. 234 at 5]. It also argues that there was probable cause to arrest

41

Townsend, and that she was in the process of being arrested, and thus the currency would have been discovered upon her formal arrest. [*Id.* at 6-7].

Next, the government argues that the public-safety exception applies to allow admission of Townsend's statement that the currency was her "school money," contending that there is a difference between Byrd being satisfied that Townsend was no danger to him during the initial detention and Johnson preparing to place a suspect into his vehicle. [*Id.* at 7-8].

Finally, as to the warrant for 8130, the government disputes Defendants' contention that the officers' ability to smell marijuana is incredible. It also contends that the evidence is not disputed that the firearms were located during the warrant's execution. [*Id.* at 8].

2. Discussion

The undersigned concludes that the 8130 warrant was not invalidated by unlawful warrantless searches or improperly obtained statements.

**a.  Laughlin's vehicle was properly stopped**

Laughlin's vehicle was properly stopped based upon at least reasonable suspicion that the display of his tag violated O.C.G.A. § 40-2-41, which provides, in relevant part that "the plate shall be fastened to the rear of the vehicle in a position so as not to swing

42

and shall be at all times plainly visible." "Dangle" is synonymous with "swing." http://thesaurus.com/browse/dangle?s=t (last visited June 26, 2012). Huffschmidt testified that the tag was dangling.

Even if reasonable suspicion was lacking as to the tag violation, Huffschmidt nonetheless had reasonable suspicion to stop Laughlin's BMW to investigate it and its driver to the suspected drug trafficking at 8130. Under *Terry v. Ohio*, 392 U.S. 1 (1968), police officers may make an investigative stop if the circumstances are sufficient to enable them reasonably to suspect that an individual is engaged in criminal activity. *Terry*, 392 U.S. at 21. Probable cause is not required to justify an investigative stop; reasonable suspicion is sufficient. *United States v. Powell*, 222 F.3d 913, 917-8 (11th Cir. 2000); *United States v. Mikell*, 102 F.3d 470, 474-5 (11th Cir. 1996). To make a showing that the officers in fact had reasonable suspicion, they "must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch" of criminal activity.'" *Illinois v. Wardlow,* 528 U.S. 119, 123-4 (2000) (quoting *Terry,* 392 U.S. at 27). Although reasonable suspicion "requires more than a hunch," *id.*, "the requisite level of suspicion to make an investigative stop is 'considerably less than proof of wrongdoing by a preponderance of the evidence.' " *United States v. Smith*, 201 F.3d 1317, 1323 (11th Cir. 2000) (quoting *United States v.*

43

*Glover*, 957 F.2d 1004, 1009 (2d Cir. 1992), and *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991)). In deciding whether the detaining officers had reasonable suspicion, the Court must look at the totality of the circumstances known to the detaining officers at the time of the detention. *Smith*, 201 F.3d at 1323; *United States v. Mikell*, 102 F.3d 470, 475 (11th Cir. 1996); *United States v. Cruz*, 909 F.2d 422, 424 (11th Cir. 1989). And, the Eleventh Circuit views the totality of the circumstances in the light of the officers' special training and experience. *Smith*, 201 F.3d at 1323 (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 884-86 (1975)); *see also United States v. Cortez*, 449 U.S. 411, 417-19 (1981); *United States v. Bowles*, 625 F.2d 526, 533-34 (5th Cir. 1980);[13] *United States v. Melvin*, No. 106-CR-197-MEF, 2007 WL 433568, at *3 (M.D. Ala. Feb. 6, 2007) ("Reasonable suspicion, though ultimately judged from an objective standard, is formed from the subjective perspective of the officer. While it is tempting to supplement the officer's subjective perception with facts and circumstances to which the officer was not privy, reasonable suspicion is gleaned solely through the narrow focus of the officer's field of vision. So, the question becomes: what information did [the officer] have at his

---

[13] In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to October 1, 1981.

AO 72A
(Rev.8/8
2)

disposal to form reasonable suspicion in stopping the car?").  At the same time, reasonable suspicion should be examined from the standpoint of the collective knowledge of all officers involved in a stop. *United States v. Blackley*, 439 Fed. Appx. 803, 805 (11th Cir. Aug. 29, 2011) (citing *United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998); *United States v. Cotton*, 721 F.2d 350, 352 (11th Cir. 1983)).

In this case, Huffschmidt was aware that neighbors complained about nighttime comings and goings from 8130, a strange smell emanated from the house as reported by the neighbors, bright lights were seen emitted from the basement at night, his fellow officers smelled fresh unburnt marijuana as they walked passed the house, the electric bill was high, and the BMW and tan Nissan were associated with the residence, and left the residence in tandem.  These facts amounted to reasonable suspicion to stop the BMW to investigate it and its driver's connection to the suspected marijuana operation at 8130.

### b.    Probable cause supported the search of the BMW

Once Laughlin opened the car door and Huffschmidt smelled marijuana, probable cause existed to search the vehicle under the so-called automobile exception. In *Carroll v. United States*, 267 U.S. 132, 153 (1925), the Supreme Court established an exception to the warrant requirement for searches of automobiles and other moving

45

vehicles.  Under the "automobile exception,"[14] "[i]f a car is readily mobile and probable

cause exists to believe it contains contraband, the Fourth Amendment . . . permits police

to search the vehicle without more."  *Pennsylvania v. Labron*, 518 U.S. 938, 940

(1996).  No separate exigent circumstances need to be shown.  *See Maryland v. Dyson*,

527 U.S. 465, 466 (1999).  The validity of the search turns on whether there was

probable cause to believe the vehicle contained contraband or evidence of a crime.  *Id.*

Probable cause for a search exists when under the totality of the circumstances "there

is a fair probability that contraband or evidence of a crime will be found in a particular

place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Goddard*, 312 F.3d

1360, 1363 (11th Cir. 2002).  This standard was satisfied in this case by Huffschmidt's

smelling marijuana as soon as the car door opened.  *United States v. Tobin*, 923 F.2d

---

[14]      The term "automobile exception" is somewhat of a misnomer, since the
Supreme Court has expressly stated that there is "no general 'automobile exception' to
the warrant requirement."  *South Dakota v. Opperman*, 428 U.S. 364, 382 (1976).
Rather, this term of art is better understood as simply embracing the now-settled
doctrine that it is permissible to conduct a warrantless search of an automobile, and any
containers found therein, provided that, at the time of the search, there is probable cause
to believe that contraband is secreted at some unspecified location within the
automobile.  *California v. Acevedo*, 500 U.S. 565 (1992); *United States v. Ross*,
456 U.S. 798 (1982).  Of course, if the police have probable cause to believe that
contraband is located in a specific area of the automobile, then a warrantless search of
the entire automobile is impermissible.  *See Arkansas v. Sanders*, 442 U.S. 753 (1979).

46

AO 72A
(Rev.8/8
2)

1506, 1512 (11th Cir. 1991) (en banc) (finding that the smell of marijuana gave rise to probable cause).

### c. Return of the BMW

Townsend moved for return of the BMW, which she alleged was registered to her, [Doc. 171], but she did not address the motion in any of her post-evidentiary-hearing filings. Therefore, she has abandoned the motion. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) (holding that issues or arguments not raised in a party's brief are abandoned). As a result, the undersigned **RECOMMENDS** that the motion, [Doc. 171], be **DENIED**.

Even if not abandoned, the motion should be denied. The controlling provision, Federal Rule of Criminal Procedure 41(g), provides:

> A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

Fed. R. Crim. P. 41(g) (2005). Although this rule was amended in 1989 to untether motions for return of property from motions to suppress for violation of the Fourth

AO 72A
(Rev.8/8
2)

Amendment,[15] there is no indication that the amendment intended to abrogate the

_____

[15]     Before amended in 1989, this rule (previously denominated as Rule 41(e)), provided in part:

> A person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized for the return of the property on the ground that such person is entitled to lawful possession of the property which was illegally seized. The judge shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted the property shall be restored and it shall not be admissible in evidence at any hearing or trial.

*See In re Grand Jury Proceedings*, 831 F.2d 222, 223 n.1 (11th Cir. 1987). The advisory committee notes to the rule explain the purpose behind the amendment:

> The amendment deletes language dating from 1944 stating that evidence shall not be admissible at a hearing or at a trial if the court grants the motion to return property under Rule 41(e). This language has not kept pace with the development of exclusionary rule doctrine and is currently only confusing. The Supreme Court has now held that evidence seized in violation of the fourth amendment, but in good faith pursuant to a warrant, may be used even against a person aggrieved by the constitutional violation. *United States v. Leon*, 468 U.S. 897 (1984). The Court has also held that illegally seized evidence may be admissible against persons who are not personally aggrieved by an illegal search or seizure. *Rakas v. Illinois*, 439 U.S. 128 (1978). Property that is inadmissible for one purpose (e.g., as part of the government's case-in-chief) may be admissible for another purpose (e.g., impeachment, *United States v. Havens*, 446 U.S. 620 (1980)). Federal courts have relied upon these decision[s] and permitted the government to retain and to use evidence as permitted by the fourth amendment.
>
> Rule 41(e) is not intended to deny the United States the use of evidence permitted by the fourth amendment and federal statutes, even if

48

judicial gloss on the rule established by *DiBella v. United States*, 369 U.S. 121, 131-32 (1962), that prohibited appeals from orders denying motions for return of property that were not solely for the return (as opposed to suppression from trial) of property and were related to a criminal prosecution. *See In re 3012 6th Avenue North, Billings, MT*, 237 F.3d 1039, 1040-42 (6th Cir. 2001) (*DiBella* rule still operative). As a result, trial courts have rejected motions for return of property when formal charges have been filed, since the appropriate vehicle for the resolution of those questions was a motion to suppress under Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure. *See United States v. A Bldg. Housing a Business Known as Mach. Products Co., Inc.*, 139 F.R.D. 111, 118, n.11 (W.D. Wis. 1990). Thus, under *DiBella*, if there is a pending criminal prosecution, courts should view Rule 41(g) motions as tied to a criminal prosecution governed by Rule 12. *White Fabricating Co. v. United States*, 903 F.2d 404, 415 (6th Cir. 1990).

---

the evidence might have been unlawfully seized. *See, e.g., United States v. Calandra*, 414 U.S. 338, 349 n.6 (1978) ("Rule 41(e) does not constitute a statutory expansion of the exclusionary rule."); *United States v. Roberts*, 852 F.2d 671 (2d Cir. 1988) (exceptions to exclusionary rule applicable to Rule 41(e)). Thus, the exclusionary provision is deleted, and the scope of the exclusionary rule is reserved for judicial decisions.

Fed. R. Crim. P. 41 advisory committee's note.

Thus, the undersigned concludes that the motion for return of property, tied as it is to the instant prosecution, should be **DENIED**.

### d. Laughlin's statements were properly obtained

The undersigned rejects Laughlin's arguments that his statements were involuntary.[16,17]    The government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with the dictates of *Miranda v. Arizona*, 384 U.S. 436 (1966), and were otherwise voluntary.  *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *Colorado v. Connelly*, 479 U.S. 156, 168 (1986);

_____

[16]    The government apparently concedes that Laughlin's detention had ripened into a custodial arrest requiring *Miranda* warnings.  [Doc. 211 at 25].  As a result, the undersigned assumes that Laughlin was in custody and that the warnings were required even though he might have been merely subjected to a non-custodial investigatory detention.

[17]    The 8130 search warrant contained the following recitation of Laughlin's statements:

> Mr. Laughlin confirmed that leaves in the trunk were marijuana leaves, that the tan Nissan that detectives lost sight of had a large amount of marijuana in it that was placed in the vehicle after removing it from his home, and that there are marijuana plants currently growing in his home at 8130 Habersham Waters Drive.  Mr. Laughlin also stated that the other male occupants at 8130 Habersham Waters Drive carry firearms on their person.

Gov't Exh. 1 at 3.

AO 72A
(Rev.8/8
2)

*Miranda*, 384 U.S. at 475. Under *Miranda*, "evidence obtained as a result of a custodial interrogation is inadmissible unless the defendant had first been warned of his rights and knowingly waived those rights." *United States v. Parr*, 716 F.2d 796, 817 (11th Cir. 1983). The government must prove by a preponderance of the evidence that the defendant waived his rights knowingly and voluntarily. *United States v. Glover*, 431 F.3d 744, 748 (11th Cir. 2005). An accused effectively waives his *Miranda* rights if he: (1) voluntarily relinquishes them as the product of a free and deliberate choice, rather than through intimidation, coercion or deception; and (2) makes his decision with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them. *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995). A waiver is effective where the totality of the circumstances reveal both an uncoerced choice and the requisite level of comprehension. *United States v. Wright*, 300 Fed. Appx. 627, 632 (11th Cir. Nov. 12, 2008) (citing *Barbour*, 70 F.3d at 585).

Despite an officer's recitation of *Miranda* rights to a suspect, subsequent statements may be involuntary because of police trickery where the deception goes directly to the nature of the suspect's rights and the consequences of waiving them. *United States v. Farley*, 607 F.3d 1294, 1329 (11th Cir. 2010) (citing *Hart v. Att'y Gen.*

51

AO 72A (Rev.8/8 2)

*of the State of Fla.*, 323 F.3d 884, 894-95 (11th Cir. 2003) (detective contradicted *Miranda* warnings by telling suspect that having a lawyer present would be a "disadvantage" and that "honesty wouldn't hurt him"); *United States v. Beale*, 921 F.2d 1412, 1435 (11th Cir. 1991) (agents told illiterate defendant that signing waiver form "would not hurt him")); *see also United States v. Lall*, 607 F.3d 1277, 1283-84, (11th Cir. 2010) (statements involuntary because officer telling suspect "wasn't going to be charging him with any of this" contradicted *Miranda* warnings previously given).

Stevens's statements to Laughlin did not contradict *Miranda*'s protections. Nothing stated by Stevens conveyed that Laughlin's statements would not be used against him in court. At most it conveyed that his cooperation would be beneficial to him. *Cf. Bradley v. Nagle*, 212 F.3d 559, 566 (11th Cir. 2000) (suggesting that cooperation would result in speedier release did not constitute sufficient police overreaching or coercion to invalidate defendant's waiver of *Miranda* rights); *United States v. Okafor*, 285 F.3d 842, 847 (9th Cir. 2002) (advising of potential sentence and benefits of cooperation did not render waiver invalid); *United States v. Broussard*, 80 F.3d 1025, 1034 (5th Cir. 1996) (promising leniency in exchange for cooperation did not render waiver invalid).

AO 72A
(Rev.8/8
2)

Nor did Stevens's statement render Laughlin's subsequent statement involuntary. The focus of the voluntariness inquiry is on whether the defendant was coerced by the government into making the statement: "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Connelly*, 479 U.S. at 170 (citation omitted). The Court must consider the totality of the circumstances in assessing whether police conduct was "causally related" to the confession. *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988). This totality-of-the-circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of "an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police. *See, e.g.*, *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973); *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996). However, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent . . . ." *Gonzalez*, 71 F.3d at 828 (citations omitted). Sufficiently coercive

53

conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984). Isolated incidents of police deception, *id.*; *Frazier v. Cupp*, 394 U.S. 731, 739 (1969), and discussions of realistic penalties for cooperative and non-cooperative defendants, *see United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992); *United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990), are normally insufficient to preclude free choice.

Considering this list of factors, while the record does not disclose Laughlin's educational level, he appears on the recording to be intelligent. At the time of being questioned, his detention had lasted approximately 25 minutes, which is not such an unduly long period of time to tip the scales toward coercion. *Cf. United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004) (30-minute detention "not beyond the pale of reasonableness" so as to convert investigative detention into *de facto* arrest). Further, other than being briefly searched, there is no evidence of any physical force

54

against Laughlin.[18]  He was put in the police car at least in part out of consideration for the cold temperatures.

As for deception, at most Stevens told Laughlin that his cooperation would be a factor in whether he would be taken to jail that night and as such amounted to a discussion of realistic penalties for cooperative defendants.  *See United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978) ( "[T]elling the [defendant] in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth is no more than affording [him] the chance to make an informed decision with respect to [his] cooperation with the government.") (citation omitted).

Therefore, Laughlin's statements were voluntary.

Next, the undersigned concludes that Laughlin did not unambiguously assert his right to counsel such that Stevens and Huffschmidt could not continue to question him. The clearest statement on counsel made by Laughlin was "Can I call my lawyer.  I have his number [unintelligible]."  Gov't Exh. 7 at 16.

If an accused asserts his right to counsel during custodial interrogation, he "is not subject to further interrogation by the authorities until counsel has been made available

_____

[18]     It is readily apparent from the recording and transcript that there was no compulsion to speak.  Without provocation, Laughlin spoke frequently and at length, offering numerous statements wholly of his own accord.

55

AO 72A
(Rev.8/8
2)

to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *see also Miranda*, 384 U.S. at 474 (holding that if an individual "states that he wants an attorney" during a custodial interrogation, the interrogation "must cease until an attorney is present"). On the other hand, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." *Davis v. United States*, 512 U.S. 452, 459 (1994). "Rather, the suspect must unambiguously request counsel." *Id.* "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Id.* at 461-62. The inquiry is objective. *Id.* at 459. Faced with an ambiguous request for counsel, police may—but are not required to—ask clarifying questions. *Id.* at 461; *see also Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259-60 (2010) (same).

The Eleventh Circuit has held that a nearly identical statement was not a clear invocation of counsel. *Ford v. Hall*, 546 F.3d 1326, 1339 (11th Cir. 2008) (suspect's question "Can I call my attorney?" was not a clear invocation of the right to counsel). *Compare Cannady v. Dugger*, 931 F.2d 752, 755 (11th Cir. 1991) ("I think I should call

56

my lawyer," was an unequivocal request for counsel); *United States v. Roberts*, 440 Fed. Appx. 859 (11th Cir. Sept. 20, 2011) ("I think I need to talk with a lawyer" an unambiguous request for counsel, citing *Cannady*).

In this case, Stevens's clarifying questions led Laughlin to state that, "No, I'm not done talking to you. I would just like to notify my lawyer in case you have to bring me anywhere," and "I don't need my lawyer to be present." Gov't Exh. 7 at 16. Also, in response to Stevens's question, "Do you want a lawyer or not," Laughlin responded, "No." *Id.*

Under these circumstances, the evidence does not establish that Laughlin made a clear and unambiguous invocation of counsel sufficient to require Stevens (and Huffschmidt) to stop questioning him.

As a result, the undersigned concludes that Laughlin's statements were voluntarily obtained and thus were properly relied upon in the search-warrant affidavit by the issuing magistrate and should not be excluded from his trial.[19]

---

[19] Even if Laughlin's statements were obtained in violation of *Miranda* or were improper, the 8130 warrant still was supported by probable cause based on the following facts: (1) Laughlin's prior arrests on drug charges, (2) the neighbors' complaints, (3) the officers' smelling marijuana coming from the house, (4) the strong odor of marijuana and the discovery of fresh marijuana leaves in Laughlin's BMW, (5) the discovery of the ballast generator in McChan's automobile and Townsend's possession of $21,000 despite her lack of lawful reported earnings (which the

### e. The generator/ballast was properly seized from the tan Nissan

In her amended motion to suppress, [Doc. 178], Townsend argued that the search of the tan Nissan was improper. [*Id.* at 4]. However, she did not address this claim in her post-hearing briefs. [*See* Doc. 218]. *Access Now, Inc.*, 385 F.3d at 1330.

To the extent that Townsend did not abandon her claim, she did not establish a legitimate expectation of privacy in the Nissan to allow her to challenge its search. Fourth Amendment rights are personal rights that may not be asserted vicariously. *See Rakas v. Illinois,* 439 U.S. 128, 133-34 (1978). An individual asserting Fourth Amendment rights "must demonstrate that [s]he personally has an expectation of

---

undersigned concludes were validly seized, *infra*), (6) the officers' observations of persons exiting 8130 carrying bags that were hidden in the gazebo, (7) one person's appearing to be carrying a firearm, the fleeing suspects, and (8) Brotemarkle and O'Neal's strongly smelling of marijuana upon their arrest. As to Defendants' contention that the officers' ability to detect the smell of fresh marijuana is incredible, the Court notes that Defendants offer nothing but argument in support of this claim. The officers' testimony about smells was corroborated by the neighbors' complaints of an odor coming from 8130. There was nothing unbelievable in the officers' testimony, given their training and experience and testimony that they were familiar with the odor of raw marijuana.

Also, Laughlin's statements during his phone call to his confederates to clean out the house was not made in response to any custodial interrogation, and thus is admissible at his trial even if Stevens's and Huffschmidt's questions are deemed to have been obtained by violation of *Miranda* or interference with his invocation of his right to counsel. *See United States v. Suggs*, 755 F.2d 1538, 1541 (11th Cir. 1985).

AO 72A
(Rev.8/8
2)

privacy in the place searched, and that h[er] expectation is reasonable [.]" *Minnesota v. Carter,* 525 U.S. 83, 88 (1998). In *Rakas,* the Supreme Court held that the defendants did not have a legitimate expectation of privacy in the glove compartment or area under the seat in a car in which they were "merely passengers." *Rakas*, 439 U.S. at 148-49. "Like the trunk of an automobile, these are areas in which a passenger *qua* passenger simply would not normally have a legitimate expectation of privacy." *Id.* Thus, a passenger usually lacks a privacy interest in a vehicle that the passenger neither owns nor rents, regardless of whether the driver owns it or rents it." *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998). The burden is on the defendant to establish a legitimate expectation of privacy. *United States v. Chayes*, 169 F.3d 687, 690 (11th Cir. 1999). Townsend did not attempt to satisfy this burden.

As a result, the discovery of the equipment in the Nissan was properly relied upon by the issuing magistrate.

### f.  Byrd properly seized the currency from Townsend

The parties agree that Townsend was in custody and not afforded *Miranda* warnings when Johnson stated to McChan and Townsend that "before you get into my police car I just need to make sure you don't have anything on you I need to know about. Do you have anything I need to know about?", T1:145, after which Townsend

59

took out—and Byrd seized—a large amount of currency.  Townsend's arguments that the currency is subject to suppression because she was not given her *Miranda* warnings is foreclosed by *United States v. Jackson*, 506 F.3d 1358, 1360-61 (11ᵗʰ Cir. 2007) (concluding, based on *Patane*, "that *Miranda* does not require the exclusion of physical evidence that is discovered on the basis of a voluntary, although unwarned, statement").

Townsend's efforts to distinguish *Patane* and *Jackson* are unconvincing.  In *Jackson*, the probation officer's question was almost identical to the one asked here: "Is there anything I should know about in there?"  *Jackson*, 506 F.3d at 1360.  While that case involved a probationer search provision, the Eleventh Circuit's opinion did not turn on the defendant's status nor on a discussion of a probationer's allegedly more limited self-incrimination rights, but rather on the fact that physical evidence obtained from an un-*Mirandized* but otherwise voluntary statement is trustworthy.  *Id.* at 1361.  As for Townsend's attempt to distinguish *Patane* on the ground that in that case, the defendant was in the process of being given his *Miranda* warnings, *Patane*, 542 U.S. at 635, the undersigned concludes that that point is a distinction without a

difference, because there were no *Miranda* warnings in *Jackson*, but the search there was deemed proper.[20]

The undersigned also rejects Townsend's challenge to her statement about the currency (although the statement did not form any part of the factual recitation for the 8130 warrant). The statement was admissible based on the public-safety exception to *Miranda* as established in *New York v. Quarles*, 467 U.S. 649, 655 (1984). In *Quarles*, the Supreme Court created a "public safety" exception to *Miranda*, allowing officers to question a suspect before giving a *Miranda* warning as long as their questions are "related[d] to an objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon." *Quarles*, 467 U.S. at 659 n.8. In outlining the bounds of the exception, the Supreme Court stressed that it does not apply to "questions designed solely to elicit testimonial evidence from a suspect." *Id.* at 659. Nor does it apply where circumstances require no "immediate action by the officers beyond the normal need expeditiously to solve a serious crime." *Id.* at 659 n.8. The exception "allows officers to question a suspect without first [providing *Miranda* warnings] when necessary to protect either themselves or the

---

[20]    As a result of concluding that the seizure was proper under *Patane*, the undersigned need not address the government's alternative argument that it was proper under the doctrine of "inevitable discovery."

61

AO 72A
(Rev.8/8
2)

general public." *United States v. Spoerke*, 568 F.3d 1236, 1249 (11th Cir. 2009) (quoting *United States v. Newsome*, 475 F.3d 1221, 1224 (11th Cir. 2007) (per curiam)). "The exception to *Miranda* also applies where there is a threat to the officers rather than the public." *Spoerke*, 568 F.3d at 1249 (quoting *Newsome*, 475 F.3d at 1225).

Here, Johnson's question was objectively reasonable and was not designed to obtain incriminating testimonial evidence. Rather than physically search McChan and Townsend prior to putting them in the back of his police car because there were no female officers present, Johnson's questions were designed to discern whether McChan or Townsend presented a physical threat to him and were not designed solely to solicit testimonial evidence. The officers were not required to forego asking the question even if they could have located a female officer.

The undersigned rejects Townsend's argument that there was no need to ask that question because Byrd already had determined that neither McChan nor Townsend were a threat to him after he approached the Nissan. First, there is no evidence that Byrd communicated such a statement to Johnson. Second, there is a significant difference between an officer determining his safety during a *Terry* detention—particularly where in the event of danger an officer has some limited means of retreat—and placing arrested suspects in the back of a police car, where the officer

AO 72A
(Rev.8/8
2)

would be in front of the suspects facing forward and would have virtually no opportunity to retreat if necessary, much less time to avert a threat from an armed arrestee. Third, Johnson was aware that others in the investigation were known to carry firearms. Thus, Townsend's response is not excludable under *Miranda*.

Therefore, the 8130 search warrant was not rendered invalid by any warrantless searches or improperly obtained statements. As a result, the undersigned **RECOMMENDS** that Laughlin and Townsend's motion and amended motion to suppress evidence and statements as to 8130 Habersham Waters Road, [Docs. 171, 178], be **DENIED**.

B.       *64 Long Island Place Search Warrant*

Neither Townsend nor Laughlin made any arguments about the Long Island Place search in their post-evidentiary brief. [*See* Docs. 218, 228]. Therefore, they have waived any objections to the search. *Access Now, Inc.*, 385 F.3d at 1330.

Even if they had not abandoned this issue, they did not establish standing to challenge the search. An individual has standing to challenge a search if "(1) he has a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable." *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008). That is, a defendant must establish both a subjective and an objective

AO 72A
(Rev.8/8
2)

expectation of privacy. *United States v. Segura-Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006); *United States v. Robinson*, 62 F.3d 1325, 1328 (11th Cir. 1995). The subjective prong is a factual inquiry, *United States v. McKennon*, 814 F.2d 1539, 1543 (11th Cir. 1987), *see also United States v. Jones*, 184 Fed. Appx. 943, 947 (11th Cir. June 22, 2006), and "requires that a person exhibit an actual expectation of privacy," *United States v. King*, 509 F.3d 1338, 1341 (11th Cir. 2007) (quoting *Segura-Baltazar*, 448 F.3d at 1286). The objective prong is a question of law, *McKennon*, 814 F.2d at 1543, and "requires that the privacy expectation be one that society is prepared to recognize as reasonable," *United States v. King*, 509 F.3d 1338, 1341 (11th Cir. 2007) (quoting *Segura-Baltazar*, 448 F.3d at 1286).

Courts assess on a case-by-case basis the "standing" of a particular person to challenge an intrusion by government officials into an area over which that person lacked primary control. *Oliver v. United States,* 466 U.S. 170, 191 n.13 (1984). No one circumstance is talismanic to this inquiry. "While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of . . . [the] inquiry." *United States v. Salvucci*, 448 U.S. 83, 92 (1980) (citation omitted). Other factors to be weighed include whether the defendant has a possessory

64

interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises. *United States v. Pitt*, 717 F.2d 1334, 1337 (11th Cir. 1983); *United States v. Haydel*, 649 F.2d 1152, 1154-55 (5th Cir. Unit A Jul. 8, 1981).

Neither defendant demonstrated "an unrestricted right of occupancy or custody and control of the premises" that would create a legitimate expectation of privacy in the residence. *United States v. Cossio*, 336 Fed. Appx. 909, 912 (11th Cir. July 8, 2009) (quoting *United States v. Baron-Mantilla*, 743 F.2d 868, 870 (11th Cir.1984)); *see also United States v. Torres*, 705 F.2d 1287, 1294-95 (11th Cir. 1983), *vacated en banc, consideration pending remand to panel*, 718 F.2d 998 (11th Cir.1983), *remanded*, 720 F.2d 1506 (11th Cir.1983), *on appeal after remand*, 741 F.2d 1323 (11th Cir.1984) (where appellants were house guests of searched house, ate, slept and showered there, stored personal belongings there and were the only guests in house at time of search, appellants would have standing to challenge search); *United States v. Garcia*, 741 F.2d 363, 366 (11th Cir. 1984) (although appellant had more than tenuous interest in searched apartment, appellant had no standing where connections were not regular

or personal enough to find that appellant adopted apartment as a place of business or as a residence). They were not listed as tenants in the lease, Gov't Exh. 5,[21] nor were they signatories to the agreement.

Also, even if they had standing, there is no evidence that Stitcher was the agent of the SSPD when he entered his property pursuant to his lease with Laughlin's father. "A search by a private person does not implicate the Fourth Amendment unless he acts as an instrument or agent of the government." *United States v. Steiger*, 318 F.3d 1039, 1045 (11th Cir. 2003). To determine whether a private person was acting as an instrument or agent of the government, the Court must consider two factors: "(1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the private actor's purpose was to assist law enforcement efforts rather than to further his own ends." *Id.*; *see also United States v. Ford*, 765 F.2d 1088, 1090 (11th Cir. 1985) (holding that the district court properly denied motion to suppress where there was no evidence that the government "had any pre-knowledge of the search [or] that the agents openly encouraged or cooperated in the search").

---

[21]     Paragraph 14 of the Lease Agreement provided, in relevant part, that the property was to be used for residential purposes only and "shall be occupied only by the  4  (#) persons listed as follows:", but the line was left blank.

66

AO 72A
(Rev.8/8
2)

In the present case, while the officers knew that Stitcher was going into the house, the evidence demonstrated conclusively that Stitcher went into the house to further his own ends.  A defendant can knowingly and voluntarily contractually agree to allow third parties to enter a space where the defendant has an expectation of privacy. *United States v. Smith*,  353 Fed. Appx. 229, 230 (11th Cir. Nov. 17, 2009) (citing *United States v. Griffin*, 555 F.2d 1323, 1324-25 (5th Cir. 1977) (holding that a warrantless search of pharmacy records was reasonable where the defendant "agreed by contract to maintain records of the prescriptions which he billed to the state and to make these records available for inspection at any time")).  Here, Stitcher was authorized pursuant to the lease agreement to "enter Premises or Property at any time to protect life and prevent damage to Premises and Property."  Gov't Exh. 5, ¶ 16.  Stitcher saw water flowing out of his property, and the cold weather made his entry onto the property all the more critical in order to assess any damage to his property.  Stitcher "had the right to enter his own premises under the above-described circumstances," *see United States v. Moffett*, 885 F. Supp. 237, 239 (N.D. Ala. 1995).  Moreover, the police told him that he did not have to enter the premises.  Stitcher entered not as an agent or representative of the police, and thus his subsequent report

AO 72A
(Rev.8/8
2)

to the police was properly included in the Long Island Place warrant application and did not qualify as a warrantless law enforcement search.

Thus, since Stitcher's observations were properly included in the warrant affidavit, and there are no unlawful fruits from the 8130 search, the undersigned **RECOMMENDS** that Laughlin and Townsend's motions to suppress as to the search of 64 Long Island Place, [Docs. 171, 178], be **DENIED**.

C.     *Oakland Search Warrant*[22]

1.     Contentions of the Parties

The government contends that even if the Court sets aside the fact that the individuals viewed by Vazquez did not resemble Townsend and Laughlin, probable cause still existed because (1) an anonymous tip stated that two individuals, first names Sarah and Phillip, were wanted from Georgia, residing at 1214 Webster, and growing marijuana, (2) Sandy Springs police corroborated the tip that Defendants were fugitives

---

[22]     Presumably the government seeks to introduce the fruits of the Oakland search warrant under Federal Rule of Evidence 404(b). The Fourth Amendment and the judicially-crafted exclusionary rule applies to evidence sought to be admitted under Federal Rule of Evidence 404(b). *See United States v. Renteria*, 625 F.2d 1279, 1282 (5th Cir. 1980) ("Unless barred by the Fourth Amendment challenge, th[e] [Rule 404(b)] evidence was properly admitted."); *United States v. Hill*, 60 F.3d 672, 679 & n.4 (10th Cir. 1995) (citing cases); *United States v. Hill*, 898 F.2d 72, 74 (7th Cir. 1990); *United States v. Ozuna*, 129 F. Supp. 2d 1345, 1350-52 (S.D. Fla. 2001).

68

AO 72A (Rev.8/82)

from a marijuana-growing charge, and (3) Vazquez smelled fresh marijuana outside the address. [Doc. 211 at 50-51]. The government further argues that while the search warrant but not the supporting affidavit spoke of the top floor of that address as the location where Sarah and Phillip were staying, Vazquez testified that the informant told him that they lived on the top floor of the three-story building. [*Id.* at 51-52].

The government then argues that *Maryland v. Garrison*, 480 U.S. 79 (1984), is instructive on the issue whether the warrant adequately described the place to be searched, because in that case the Court held that the failure to specify which apartment unit could be searched was not fatal to a warrant where the police believed there was only a single unit on that floor and did not determine there were multiple units until they executed the warrant. [Doc. 211 at 52-53]. Referring to the *Garrison* Court's language that courts "must judge the constitutionality of [the officers'] conduct in light of the information available to them at the time they acted," [*id.* (quoting *Garrison*, 480 U.S. at 85)], the government argues that Vazquez's surveillance did not include entering 1214 Webster, so he did not know whether there were multiple units on the top floor, and he did not investigate how many units there were. The government contends, nonetheless, that the row of windows along Webster Street suggested only one unit, and—as Vazquez later discovered—at least two windows around the corner on

69

12th Street belonged to the unit in which Defendants were found. [Doc. 211 at 53 (citing T1:135, 136 & Gov't Exhs. 13, 14, 15)]. The government adds that the warrant was valid and authorized entry onto the premises generally and the common areas, including the top floor, where they encountered an open door and the strong smell of marijuana coming from Defendants' unit, and Vazquez never determined whether there were additional units because he went immediately to the one on the right (Defendants'). [*Id.* at 53]. The government then argues that:

> Based upon that information, [the officers] reasonably concluded that the unit was the place to be searched, and they had probable cause to search based on the odor of marijuana. Therefore, the officers' search was lawful under the Fourth Amendment.

[*Id.* at 54 (citation and parenthetical omitted)].

In her post-evidentiary brief, Townsend notes that the Court made a preliminary finding that Vazquez was not credible. [Doc. 218 at 7]. She then argues that his affidavit was false in a number of ways, including his description of the suspects, where he obtained his information about the suspects, his knowledge of upon which floor the suspects lived, the presence of a third person not described by the tipster, and the description of the vehicle not described by the tipster. [*Id.*]. She faults the government

70

for ignoring Vazquez's inconsistent testimony and argues that the warrant cannot be supported by good faith.   [*Id.*].

Laughlin contends the Oakland search warrant is invalid because it was obtained in reckless disregard of the truth and if the false material is set aside, the affidavit is insufficient to establish probable cause.   He argues that Vazquez's testimony demonstrated inconsistencies between the descriptions of Defendants and those in the building and that Vazquez just assumed that he should search the top floor.   Laughlin argues that the description of the place to be searched was overbroad, citing *Groh v. Ramirez*, 540 U.S. 551 (2004), and states that Vazquez's testimony was inconsistent, evasive, and not credible.   [Doc. 228 at 1].

In reply, the government contends that Laughlin's argument that Vazquez "assumed" he should search the top floor is wrong because Vazquez testified that he received a tip indicating that the Phillip and Sarah fugitives were living on the top floor of that location and that, consistent with that information, Vazquez asked to search the top floor.   [Doc. 234 at 9-10].   The government concedes that the warrant did not identify the unit number but argues that *Garrison* allows the Court to consider the conduct of the officers, who—when confronted with the smell of marijuana coming

71

from Defendants' unit's open door—acted reasonably in limiting the scope of their search to that apartment. [*Id.* at 10].

2. <u>Discussion</u>

The 1214 Webster Avenue search warrant presents the following issues: whether material misstatements rendered the warrant not supported by probable cause; whether the warrant adequately described the place to be searched; and whether good faith saved the warrant if it was issued without probable cause.

a. **Franks** *and Probable Cause*

"Affidavits supporting [search] warrants are presumptively valid." *United States v. Sarras*, 575 F.3d 1191, 1218 (11th Cir. 2009) (quoting *United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009)); *see also Franks v. Delaware*, 438 U.S. 154, 171 (1978) ("There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant."). A defendant may challenge a search warrant affidavit, however, through a *Franks* hearing if he: (1) makes a substantial preliminary showing that the affidavit contains a deliberately false statement or a statement made with reckless disregard for the truth[23]; and (2) shows that the statement is material, *i.e.*,

_____

[23]    To make this showing, the defendant's attack must be more than conclusory and must be supported by more than a

72

necessary for making a probable-cause finding.[24]  *Sarras*, 575 F.3d at 12 (citing

*Kapordelis*, 569 F.3d at 1309, and *Franks*, 438 U.S. at 155-56).  When a *Franks*

hearing is held, a court will suppress evidence stemming from a search warrant when:

(1) the defendant shows by a preponderance of evidence that the search warrant

affidavit contains perjurious statements or statements made with a reckless disregard

for the truth;[25] and (2) the search warrant is no longer supported by probable cause after

---

> mere desire to cross-examine.  There must be allegations of deliberate
> falsehood or of reckless disregard for the truth, and those allegations must
> be accompanied by an offer of proof.  They should point out specifically
> the portion of the warrant affidavit that is claimed to be false; and they
> should be accompanied by a statement of supporting reasons.  Affidavits
> or sworn or otherwise reliable statements of witnesses should be
> furnished, or their absence satisfactorily explained.  Allegations of
> negligence or innocent mistake are insufficient.  The deliberate falsity or
> reckless disregard whose impeachment is permitted . . . is only that of the
> affiant, not of any nongovernmental informant.

*Franks*, 438 U.S. at 171.

[24]    To determine whether a statement is material, the court will set aside
material that is the subject of the alleged falsity or reckless disregard and examine
whether the remaining content in the warrant affidavit supports a finding of probable
cause.  If the affidavit still supports a probable-cause finding, no hearing is necessary.
However, if the remaining content is insufficient, the defendant is entitled, under the
Fourth and Fourteenth Amendments, to his hearing.  *Franks*, 438 U.S. at 171-72.

[25]    Additionally, "a government agent or instrumentality making deliberately
or recklessly false statements to an affiant that cause the affiant, in turn, to innocently
make false statements in an affidavit can trigger the misstatements to be stricken from

AO 72A
(Rev.8/8
2)

setting aside the perjurious or reckless statement. *See United States v. Novaton*, 271 F.3d 968, 986 (11th Cir. 2001).[26]

The 1214 Webster warrant contained several misstatements that must be excised from the affidavit before determining whether the warrant was supported by probable cause. First, Vazquez had an affirmative obligation to tell the issuing judge that the persons he saw on the curb in front of the location during surveillance were not the same persons depicted in the photographs he received from Sandy Springs. He did not do so, and thus his description of the individuals he observed should not have been contained in the affidavit without a statement explaining that the physical characteristics of these individuals were different than those of the Georgia fugitives. Second, Vazquez's affidavit was similarly untruthful when he stated as fact that "[i]t appeared the two individuals entered 1214 Webster Street top floor Oakland, CA

_____

the affidavit in determining probable cause." *O'Ferrell v. United States*, 968 F. Supp. 1519, 1533 (M.D. Ala. 1997) (citing *Franks*, 438 U.S. at 163 n.6, and *United States v. Kirk*, 781 F.2d 1498, 1503 & n.5 (11th Cir. 1986)).

[26]  *Franks* also applies when the "misinformation" involves omissions from the affidavit " 'made intentionally or with a reckless disregard for the accuracy of the affidavit.' " *Madiwale v. Savaaiko*, 117 F.3d 1321, 1326-27 (11th Cir. 1997) (quoting *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980)). Intentional or reckless omissions will invalidate a search warrant "only if the inclusion of the omitted facts would have prevented a finding of probable cause." *Sarras*, 575 F.3d at 1218 (quoting *Kapordelis*, 569 F.3d at 1309).

74

94612," Gov't Exh. 3 at 3, since he merely "assumed" that to be the case in order to corroborate what the tipster stated. T1:123-24. As a result, these statements must be set aside during the Court's review of the warrant affidavit.

The question, then, is whether the balance of the affidavit still satisfied the probable-cause standard. Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location. *See United States v. Noriega*, 676 F.3d 1252, 1261 (11th Cir. 2012); *United States v. Gonzalez*, 940 F.2d 1413, 1419 (11th Cir. 1991). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts[.]" *Gates*, 462 U.S. at 232; *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999). "[P]robable cause deals 'with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Gates*, 462 U.S. at 241 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). The task of the issuing magistrate judge in determining whether to issue a warrant "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence

75

of a crime will be found in a particular place." *Gates*, 462 U.S. at 232; *United States v. Jiminez*, 242 F.3d 1243, 1248 (11th Cir. 2000). To avoid "rigid" legal rules, *Gates* changed the "two-pronged test" of *Aguilar v. Texas*, 378 U.S. 108, 114 (1964), into a totality-of-the-circumstances test. *See Gates*, 462 U.S. at 230-35; *Brundidge*, 170 F.3d at 1352-53. Under the *Gates* totality-of-the-circumstances test, the "veracity" and "basis of knowledge" prongs of *Aguilar*—for assessing the usefulness of an informant's tips—are not independent. "[T]hey are better understood as relevant considerations in the totality of the circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for . . . by a strong showing as to the other[.]" *Gates*, 462 U.S. at 233; *Brundidge*, 170 F.3d at 1353. That is, "[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) (citing *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000)). However, independent police corroboration is not a requirement in each and every case. *Brundidge*, 170 F.3d at 1353. For example, "[a]n 'explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles the [confidential informant's] tip to greater weight than might otherwise be the case.' " *United States v. Robinson*,

76

202 Fed. Appx. 434, 436 (11th Cir. Oct. 27, 2006) (quoting *Brundidge*, 170 F.3d at 1353) (citations omitted in original).

In deciding whether to issue a search warrant, the issuing judge may rely upon the opinions and conclusions of an experienced law enforcement agent-affiant, *United States v. Robinson*, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995), since "[c]onduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer." *United States v. Gonzalez*, 969 F.2d 999, 1004 (11th Cir. 1992) (quoting *United States v. Fouche*, 776 F.2d 1398, 1403-04 (9th Cir. 1985)).

Finally, "probable cause must exist when the magistrate judge issues the search warrant," *United States v. Santa*, 236 F.3d 662, 672 (11th Cir. 2000) (quoting *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994)), because a search is not to be made legal by what it turns up. *United States v. Di Re*, 332 U.S. 581, 595 (1948).

The task of a reviewing court is not to conduct a *de novo* determination of probable cause but only to determine whether there is substantial evidence in the record supporting the magistrate judge's decision to issue the warrant, *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984), affording "great deference to judicial determination of probable cause to issue a search warrant," *Robinson*, 62 F.3d at 1331 (citing *Gonzalez*, 940 F.2d at 1419). Courts reviewing the legitimacy of search warrants should not

AO 72A
(Rev.8/8
2)

interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable-cause determinations. *Gates*, 462 U.S. at 236-37 (citing *United States v. Ventresca,* 380 U.S. 102, 109 (1965)); *see also United States  v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994).  As the Supreme Court has instructed, "[a]lthough in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants."  *Upton*, 466 U.S. at 734 (quoting *Ventresca*, 380 U.S. at 109).

The issuing judge properly could rely upon the following information in determining whether to issue the Oakland search warrant:

- an anonymous tip stated that two fugitives from the Atlanta, Georgia, area were wanted for marijuana cultivation and weapons violations, that the charges "had gone federal" and that they had fled on a $150,000 bond

- the fugitives, whose first names were Phillip and Sarah,  were now living at 1214 Webster Street, top floor, in Oakland, California, where they have approximately 60-80 marijuana plants, two pit bull dogs, and possibly weapons

- less than three hours after getting word of the tip, Vazquez and his partner went to the location, and when 30 to 40 feet from the location, they

smelled fresh, uncut, and un-burnt marijuana but noticed no other persons in the area as they walked by

- Vazquez's experience included assistance in the investigation and investigation of numerous indoor marijuana-cultivation operations (Gov't Exh. 3 at 3)

- once the officers passed the location, they did not smell the marijuana anymore

- one week later, Vazquez spoke with Spears, and after stating why he was calling, Spears asked if his call concerned a male and female, and then he gave Vazquez the names and Georgia driver's license numbers of Defendants

- Spears told Vazquez that Laughlin and Townsend were the principals in a large marijuana-cultivation case and had fled after their arrests

- Vazquez then located the arrest warrants and discovered that they both had prior arrest history, including drug charges

- the next day, Vazquez spoke with a U.S. Marshal in San Francisco, who related that a U.S. Marshal informant in Texas advised that Laughlin and Townsend had fled to the San Francisco Bay area because Laughlin had a sister in San Francisco, and that they were growing marijuana in the area in order to raise money to flee the country

Gov't Exh. 3 at 3-4.

Although the case is close, the undersigned concludes that this information established probable cause to believe that Defendants were cultivating marijuana on the top floor of the 1214 Webster Street. Initially, although the undersigned viewed

AO 72A
(Rev.8/8
2)

Vazquez's evidentiary hearing testimony as at times not credible, dissembling, and cavalier, that does not authorize the Court to discard the entire affidavit. Under *Franks*, only statements that are deliberately or recklessly false must be set aside. 438 U.S. at 171; *see also United States v. Schwinn*, 376 Fed. Appx. 974, 978 (11th Cir. Apr. 28, 2010) (holding that where affidavit contains deliberately or recklessly made false statements, "the defendant is entitled to a new evaluation of probable cause with the affidavit stripped of the false statements.") (citation omitted). The evidence simply does not support a conclusion that any other statement in the affidavit was deliberately or recklessly false.

As for the informant information related in the affidavit, while the initial informant's tip emailed from the Chief of Police's office did not disclose the basis for the informant's tip or whether the informant had given information in the past that was deemed reliable, several facts support a conclusion that the information was reliable. First, the informant's information that Defendants were cultivating marijuana at the location was corroborated by Vazquez and his partner smelling marijuana as they walked by the location.[27] *See United States v. Birdsong*, 446 F.2d 325, 327-28 & n.4

_____

[27] Again, nothing in the record makes Vasquez's statement about smelling marijuana unbelievable. While there were aspects of his affidavit that the Court found untruthful, and his manner of testifying at times reflected an attitude that he was

AO 72A
(Rev.8/8
2)

(5th Cir. 1971) (smell of mash emanating from defendant's home corroborated tip that defendant was making whiskey); *see also United States v. Elkins*, 300 F.3d 638, 659-60 (6th Cir. 2002) (officers' detection of marijuana smell inside house corroborated anonymous informant's tip that defendants were growing marijuana inside house). This information also was corroborated by the U.S. Marshal's Texas informant who reported that Defendants were cultivating marijuana to raise funds to flee the country. *United States v. One 56-Foot Yacht Named Tahuna*, 702 F.2d 1276, 1287 (9th Cir. 1983) (tips reliable where independently corroborated by other tips); *United States v. Benjamin*, 31 Fed. Appx. 290, 291 (4th Cir. Mar. 29, 2002) (holding that two tips—corroborated as they were by each other and by the officers' independent knowledge and further corroboration—provided sufficient articulable suspicion to stop defendant's vehicle).

Second, the informant's conveyed information that "Phillip" and "Sarah" were fugitives from a marijuana cultivation case in the Atlanta, Georgia, area was confirmed by Spears telling Vazquez that Defendants in fact fled following their arrests for a marijuana cultivation, and by the U.S. Marshal's Texas informant's information that

---

perturbed at having to answer questions, the Court is unable to disregard all of his affidavit or testimony. His affidavit sets out his experience in investigating marijuana grow operations and there is no evidence in the record that this statement is false or recklessly made. It is credible that an officer experienced in marijuana cultivation investigations would be competent to testify that he smelled marijuana.

they had fled to the San Francisco Bay area because Laughlin had a sister in San Francisco.

Third, Defendants' prior arrest records and their fugitive status from drug charges in Georgia also corroborated the informant's tip. *United States v. Foree*, 43 F.3d 1572, 1576 (11th Cir. 1995) (evidence of prior drug activity corroborates allegations by an informant).

As a result, the totality of circumstances demonstrates that the informant's information as to Defendants' presence at the location and their operation of a marijuana grow operation on the top floor of 1412 Webster Street was reliable. *Gates*, 462 U.S. at 243-46 (finding that there was probable cause for the search based, in part, on the anonymous letter because the officers had corroborated major parts of the letter); *see also id.* at 242-45 (relying on *Draper v. United States*, 358 U.S. 307, 309-10, 313 (1959)). In *Draper*, the Supreme Court found that the officers had probable cause to arrest the defendant based on a tip from a reliable informant and the fact that the officers had corroborated every detail provided by the source except whether the defendant possessed narcotics. *See* 358 U.S. at 313.

To the extent that Defendants' argument is that the government did not establish that there were no additional units on the top or third floor of the location searched, the

AO 72A
(Rev.8/8
2)

undersigned recognizes that Vazquez conceded that he did not take any steps whatsoever to determine if more than one unit existed on the top floor of 1214 Webster and, if so, which unit Defendants lived in.  This lack of effort pales in comparison to the police efforts in *Garrison*, 480 U.S. at 86 n.10, and *Schwinn*, 376 Fed. Appx. at 981, to determine the layout of the buildings they were searching, utility registration and the suspects' connections to them.  Nonetheless, the burden of establishing that the warrant in this case was defective (and that it was executed improperly) is upon Defendants. *Franks*, 438 U.S. at 171; *United States v. Van Horn*, 789 F.2d 1492, 1500 (11th Cir. 1986); *United States v. Marx*, 635 F.2d 436, 441 (5th Cir. Unit B 1981); *United States v. Osborne*, 630 F.2d 374, 377 (5th Cir. 1980).  There is no evidence in the record that establishes that there was another apartment unit on the top (third) floor of 1214 Webster, or that Vazquez knew or had reason to believe that there was more than one unit on that floor and did not disclose that fact to the issuing judge.

As a result, even if the warrant application is read without the statements the undersigned finds untruthful, probable cause supported the issuance of the warrant.

AO 72A
(Rev.8/8
2)

### b. Adequacy of description of place to be searched/execution of the warrant

That there was probable cause to search the top floor of the location does not end the matter, because the Fourth Amendment requires that warrants "*particularly describ*[*e*] the place to be searched." U.S. Const. amend IV (emphasis supplied). In addition, the Court must also examine the reasonableness of the warrant's execution. *Garrison*, 480 U.S. at 84 (citing *Dalia v. United States*, 441 U.S. 238, 258 (1979)); *Schwinn*, 376 Fed. Appx. at 980.

Both *Garrison* and *Schwinn*[28] dictate the result in this case. In *Garrison*, the police obtained a search warrant for a third-floor apartment, reasonably believing that there was only one apartment unit on that floor. The target of the investigation and the warrant, McWebb, provided a key to enter the third floor where they found two open doors and Garrison. After the police entered and located the narcotics possessed by

_____

[28] The undersigned recognizes that unpublished decisions do not constitute binding precedent. *See Moore v. Barnhart*, 405 F.3d 1208, 1211 n.3 (11th Cir. 2005). Per 11th Cir. R. 36-2, unpublished decisions like *Schwinn* are not considered binding precedent but may be cited as persuasive authority. *United States v. Moore*, 541 F.3d 1323, 1328 n.3 (11th Cir. 2008); *see also Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1345 n.7 (11th Cir. 2007) ("Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants."). The undersigned follows *Schwinn* because its analysis is persuasive and is based on and consistent with a Supreme Court decision.

AO 72A
(Rev.8/8
2)

Garrison, they became aware that the unit was actually divided into two apartments, one being McWebb's and the other being Garrison's. *Garrison*, 480 U.S. at 81. The Court held that the search warrant was properly executed because the officers were authorized by the warrant to enter the third-floor common area; if the officers had known or had reason to know the floor was subdivided, they would have been limited to searching only McWebb's apartment; and as soon as they recognized there were two apartments on the floor, the police stopped searching. *Id.* at 86-87. The Court concluded that because the objective facts available to the officers at the time they obtained the warrant suggested no distinction between McWebb's apartment and the third-floor premises, their failure to realize the overbreadth of the warrant was objectively understandable and reasonable. *Id.* at 88.

> For that reason, the officers properly responded to the command contained in a valid warrant even if the warrant is interpreted as authorizing a search limited to McWebb's apartment rather than the entire third floor. Prior to the officers' discovery of the factual mistake, they perceived McWebb's apartment and the third floor as one and the same; therefore, their execution of the warrant reasonably included the entire third floor.

*Id.* at 88.[29]

--------

[29] The Court also held that the police conduct in that case was consistent with a reasonable effort to ascertain and identify the place intended to be searched. *Garrison*, 480 U.S. at 88. As noted in the text *supra*, in this case Defendants bore the burden of at least establishing that their apartment was not co-extensive with

AO 72A
(Rev.8/8
2)

Similarly, in *Schwinn*, the warrant authorized a search of "Unit # 302" as if it was a single dwelling when in fact it was a collection of individual efficiencies (separate bedrooms with shared facilities for cooking and washing). *Schwinn*, 376 Fed. Appx. at 979. First, the Eleventh Circuit rejected the defendant's contention that the warrant was defective because it lacked particularity, holding instead that the issue was one of probable cause to issue the warrant in the first place. *Id.* at 980. It noted that a warrant's validity is determined upon its issuance on " 'the basis of the information the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate.' " *Id.* (quoting *Garrison*, 480 U.S. at 85). The *Schwinn* Court noted that as long as probable cause existed to search the entire area described in the warrant when the warrant issued, the warrant is valid, and facts learned after the search has begun do not retroactively invalidate the warrant; instead, "with new information in hand, the officers executing the warrant must do so reasonably." *Schwinn*, 376 Fed. Appx. at 980-81 (citing *Garrison*, 480 U.S. at 82-88). In *Schwinn*, the Eleventh Circuit found the officers executed the warrant reasonably. When they entered Unit # 302, they discovered that the unit entered directly into the defendant's

the top floor of 1214 Webster before the Court would have to evaluate whether the police exercised a reasonable effort to ascertain and identify the place intended to be searched.

86

AO 72A
(Rev.8/8
2)

bedroom, but then discovered that the unit actually consisted of three bedrooms and shared dining, bath, and kitchen facilities. In addition to Schwinn's bedroom, they searched an uninhabited bedroom, but not another bedroom that was locked and to which Schwinn stated he did not have access. The court concluded, therefore, that the officers reasonably limited the scope of the warrant by not attempting to enter the locked bedroom. Id. at 982-83.

Similarly, in the instant case, the officers had probable cause to believe that Defendants occupied the top floor of 1214 Webster Street and were cultivating marijuana there. The officers were authorized by the warrant to enter the building and proceed to the top floor. When they entered the top floor, the door to Defendants' unit was open, although gated. They smelled marijuana coming from that apartment and entered. They reasonably limited the scope of the warrant by not attempting to enter any other units on that floor, to the extent they existed.[30]

---

[30] The undersigned rejects Defendants' arguments that *Groh v. Ramirez*, 540 U.S. 551 (2004), compels a different result. In *Groh*, the warrant did not describe the persons or things to be seized, although the items to be seized were described in the supporting affidavit. *Id.* at 554-55. In the present case, there is no dispute that both the warrant and the application adequately described the items to be seized. Thus, *Groh* is inapposite.

AO 72A
(Rev.8/8
2)

As a result, the undersigned concludes that Defendants' motion to suppress the evidence found in executing this search warrant should be **DENIED**.[31]

### D.  *Destruction of the marijuana*

#### 1.  Contentions of the Parties

The government contends that it is entitled to destroy the bulk marijuana seized in this case because it (through the Sandy Springs Police Department) complied with 28 C.F.R. § 50.21 in that it conducted appropriate tests on of the samples, took photographs and video of the marijuana as it was originally found to use as exhibits at trial, and maintained a representative sample of the marijuana plants.  [Doc. 188 at 3].

Townsend initially objected on the grounds that the government's alleged failure to properly preserve the marijuana violated her due-process rights.  First, she argues that the bulk evidence was significant because the type, condition, and description of the marijuana was used as a basis for the probable-cause showing in the search w arrant affidavits, particularly since the officers held themselves out as experts in detecting the

---

[31]     Because the undersigned finds that probable cause existed to search 1214 Webster Street, top floor, and the officers acted reasonably in entering and searching Defendants' apartment, the undersigned need not discuss whether the *United States v. Leon*, 468 U.S. 897, 913 (1984), "good faith" exception applies or it is rendered inapplicable by the Court's finding that the affidavit contained false or recklessly made statements.

88

smell of live marijuana plants. [Doc. 189 at 2]. She also contends that the bulk

marijuana is significant because the number and viability of the plants as well as their

weight determines the appropriate sentence in this case, and police allowed critical

evidence to deteriorate. [*Id.*]. She submits that allowing the plants to be stored in

conditions that would lead to their deterioration and ultimate destruction was bad

faith. [*Id.*].

Townsend followed up her objections to the destruction of the marijuana with

a motion to suppress the evidence, arguing that allowing the evidence to deteriorate

demonstrated bad faith and thus violated her due-process rights. [Doc. 217].

Recognizing her burden to establish both (1) that the exculpatory value of the evidence

that was destroyed was apparent before its destruction and that the defendant would be

unable to obtain comparable evidence by other reasonable available means, and (2) that

the police acted in bad faith, she contends that (1) the number and viability of the plants

are material trial and sentencing issues, given that she is charged with having

manufactured over 1000 marijuana plants, and (2) their destruction by deterioration was

done in bad faith. [*Id.* at 3-4]. She also disagrees with the Court's concern at the

evidentiary hearing that the length of her fugitivity contributed to the deterioration of

AO 72A
(Rev.8/8
2)

the marijuana plants, contending that the plants' deterioration began long before the case went federal and Defendants absconded. [*Id.* at 8-9].

In support of her arguments, Townsend contends that the evidence demonstrated that Sandy Springs police officers clearly knew the significance of the condition and number of plants because they counted them and knew that they had to store them. She also points to the Fulton County State Court and District Attorney's Office's rejections of requests to destroy the bulk marijuana as proof of the materiality. [*Id.* at 9-10].

She further contends that due process was violated when the evidence was destroyed through deliberate neglect as opposed to preserving them. In support, she points to Marschalk's testimony that he knew that placing the plants in plastic bags would cause their faster decomposition and that he had to air dry them to preserve them as evidence, but that placing the plants in paper bags was not the same as air drying them. [*Id.* at 10]. She also contends that Marschalk knew of the difference between gathering plants as evidence and storing them as evidence but chose to ignore the difference and stored the plant material in paper bags, knowing they would decompose. [*Id.*]. Townsend also argues that since the officers knew how to preserve the evidence but chose not to do so, the officers' excuses for not properly preserving the evidence—space limitations, odor and mold—demonstrate that the loss of the plant

AO 72A
(Rev.8/8
2)

material was not accidental but in bad faith. [*Id.* at 10-11]. Laughlin essentially adopts Townsend's arguments. [*See* Doc. 226].

In response, the government argues that Defendants have to show bad faith in order to demonstrate a due-process violation, and the government claims that the officers' storage of the plants in containers that led to their decomposition does not demonstrate bad faith. [Doc. 235 at 9-10]. First, the government argues that the SSPD followed both the DEA and its own procedures in the preservation and destruction of evidence, and cites to cases where the destruction of evidence pursuant to established policies was found to preclude a bad-faith finding. [*Id.* at 10-12]. The government also argues that even if the SSPD did not follow the procedures—which could provide some evidence of bad faith—the case law holds that such a failure does not, in and of itself, constitute bad faith, in part because the plants were moved to storage containers due to the mold and odor. [*Id.* at 13].

2.   Discussion

In order to show that the loss of or failure to preserve evidence by the government constitutes a denial of due process, Defendants must show that the evidence was material, *i.e.*, that it was likely to significantly contribute to their defense, and that the police acted in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988);

91

*United States v. Brown*, 9 F.3d 907, 910 (11th Cir. 1993). In the absence of bad faith, dismissal on due-process grounds may still be ordered if the evidence at issue " 'possess[ed] an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' " *Brown*, 9 F.3d at 910 (quoting *California v. Trombetta*, 467 U.S. 479, 489 (1984)).

Taking the second scenario first, the undersigned concludes that Defendants cannot establish bad faith because they have not shown that the plants possessed an exculpatory character that was apparent before they were destroyed. In this regard, the plants were counted, videotaped, and photographed before they decomposed. Defendants have not pointed out to the Court from this alternative evidence that is at their disposal for review and analysis how the actual plant material was exculpatory, and that the police knew that at the time they destroyed it.

As to the *Youngblood* standard, while the plant material certainly is material, Defendants have not shown that in allowing the plant material to decompose, the SSPD acted in bad faith. First, the undersigned points out that the government misses the gist of Defendants' argument. Defendants are not arguing that bad faith is established due to the police's removing the plants to a steel container outside because of the smell and

92

the mold. Instead, Defendants argue that failing to dry the plants prior to storing them with knowledge that failure to do so would cause them to decompose means that the police acted in bad faith.[32]

Nonetheless, the undersigned finds that the SSPD did not act in bad faith in failing to dry all of the plants so as to preserve them. First, the officers complied with their own and DEA procedures. The undersigned concludes that the SSPD did not violate its own policy because the policy regarding drying wet plant material applies only to those items to be submitted to the GBI Crime Lab, and not to the storage of wet plant material in the department's own storage facility. Townsend Defense Exh. 1 at 7-8. The SSPD also complied with DEA standards in giving notice of their intent to destroy the marijuana and processing a representative sample. 28 C.F.R. § 50.21.[33]

_____

[32] To that extent, Defendants also are correct that the Court's concern about their fugitivity is irrelevant.

[33] That regulation provides, in relevant part:

When contraband drug substances in excess of the threshold amount or in the case of marijuana a quantity in excess of the representative sample are seized pursuant to a criminal investigation and retained in the custody of the Federal Bureau of Investigation or Drug Enforcement Administration, the Agency having custody shall:

(1) Immediately notify the appropriate U.S. Attorney, Assistant U.S. Attorney, or the responsible state/local

93

AO 72A
(Rev.8/8
2)

prosecutor that the amount of seized contraband drug exceeding the threshold amount and its packaging, will be destroyed after sixty days from the date notice is provided of the seizures, unless the agency providing notice is requested in writing by the authority receiving notice not to destroy the excess contraband drug; and

(2) Assure that appropriate tests of samples of the drug are conducted to determined the chemical nature of the contraband substance and its weight sufficient to serve as evidence before the trial courts of that jurisdiction; and

(3) Photographically depict, and if requested by the appropriate prosecutorial authority, videotape, the contraband drugs as originally packaged or an appropriate display of the seized contraband drugs so as to create evidentiary exhibits for use at trial; and

(4) Isolate and retain the appropriate threshold amounts of contraband drug evidence when an amount greater than the appropriate threshold amount has been seized, or when less than the appropriate threshold amounts of contraband drugs have been seized, the entire amount of the seizure, with the exception of marijuana, for which a representative sample shall be retained; and

(5) Maintain the retained portions of the contraband drugs until the evidence is no longer required for legal proceedings, at which time it may be destroyed, first having obtained consent of the U.S. Attorney, an Assistant U.S. Attorney, or the responsible state/local prosecutor;

(6) Notify the appropriate U.S. Attorney, Assistant U.S. Attorney, or the responsible state/local prosecutor to obtain

Although the undersigned has not located any Eleventh Circuit decisions on this point, other courts have held that compliance with an established procedure precludes a finding of bad faith. *United States v. Deaner*, 1 F.3d 192, 200 (3d Cir. 1993); *United States v. Barton*, 995 F.3d 931, 935 (9th Cir. 1995) (recognizing that compliance with departmental procedure should be regarded as an indication that disposal of evidence was not done in bad faith) (citation omitted); *see also United States v. Coots*, 408 Fed. Appx. 968, 973 (6th Cir. Feb. 10, 2011) (finding no bad faith where "officers acted in accordance with their normal practice of preserving only those plants necessary for laboratory testing - a practice we have repeatedly held does not violate due process," and citing cases).[34]

---

> consent to destroy the retained amount or representative sample whenever the related suspect(s) has been a fugitive from justice for a period of five years. An exemplar sufficient for testing will be retained consistent with this section.

28 C.F.R. § 50.21(e). The undersigned notes that marijuana has been deemed by regulation not to be subject to the preservation of biological substances under 18 U.S.C. § 3600A(b). *See* 28 C.F.R. § 28.23(b) (Example 2).

[34] The Court also notes that Marschalk's attempts through the Fulton County District Attorney's Office and Fulton County Superior Court to obtain approval to have the excess marijuana destroyed does not establish bad faith, but in fact demonstrates his good faith, since he sought the advice of superiors and legal authorities and did not act contrary to their advice/directives.

95

AO 72A
(Rev.8/8
2)

Finally, the undersigned does not find bad faith imputable to the SSPD because its improper storage facilities caused the marijuana to decompose. "The presence or absence of bad faith . . . necessarily turn[s] on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n.*; *see also United States v. Bohl*, 25 F.3d 904, 911 (10th Cir. 1994). *Youngblood* described bad faith in other contexts as meaning " 'to gain some tactical advantage over [defendants] or to harass them,' " *Youngblood*, 488 U.S. at 57 (quoting *United States v. Marion*, 404 U.S. 307, 325 (1971)), or where "the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Youngblood*, 488 U.S. at 88. The Ninth Circuit finds bad faith when the officers knowingly handled the marijuana for the purpose of destroying it. *Barton*, 995 F.3d at 936.

None of those circumstances are present here. As previously noted, despite the existence of alternative evidence of the plants such as videos and photographs, Defendants have not demonstrated—even in a *prima facie* fashion—that exculpatory (not merely material) evidence was destroyed by the SSPD's handling of the marijuana. Courts have held that bad faith is not demonstrated where evidence was preserved by photographing or videotaping it and maintaining samples. *United States v.*

96

AO 72A
(Rev.8/8
2)

*Revolorio-Ramo*, 468 F.3d 771, 775 (11th Cir. 2006) (no bad faith where the Coast Guard destroyed a fishing vessel but preserved the condition of the boat with still and video photographs, even if most of the images were unusable); *United States v. Newsome*, 322 F.3d 328, 334 (4th Cir. 2003) (no suppression of evidence required where, although the government did not preserve the logs stolen from a National Forest, the defendant was given an opportunity to view photographs and cookies cut from the logs, access mill records, and cross-examine mill employees and government agents); *United States v. Scoggins*, 992 F.2d 164, 167 (8th Cir. 1993) (before destruction mandated by departmental policy, police sampled and videotaped marijuana plants); *United States v. Allen*, 954 F.2d 1160, 1168-69 (6th Cir. 1992) (no due process violation in defendant's inability to refute number of marijuana plants manufactured where no bad faith was shown and plants had been counted prior to their destruction by agents).

Nor have Defendants shown that the officers handled the marijuana in such a way as to obtain an advantage over them, to harass them, to prevent their exoneration, or for the purpose of destroying the marijuana. Mere negligence in failing to preserve evidence is insufficient. *See Bohl*, 25 F.3d at 912.

In addition to Defendants' not showing that the SSPD's method of storing the plants was designed to destroy them, the evidence shows at most that the police were

97

guilty of lack of facilities to store the marijuana.  As for putting the plants in plastic

bags to take them back to the police headquarters because they ran out of paper bags,

any harm caused by that action was *de minimus*, since the plants were placed in paper

bags the next day.  Also, this action appears to be due to the lack of unanticipated

planning, not bad faith.  *Cf. United States v. Dougherty*, 774 F. Supp. 1181, 1187

(W.D. Wisc. 1989) (destruction of plants due to poor planning, not bad faith).  The real

obstacle was the Sandy Springs Police Department's inability to properly dry over 1100

marijuana plants.  Due process does not require that the SSPD had go to extraordinary

efforts (particularly where such efforts either depend on favorable weather or a vast

expenditure of limited public funds to rent a facility capable of both allowing such a

large number of marijuana plants) in order to properly dry such a large quantity of plant

material and at the same time, make sure that they are secure from tampering or theft.

Therefore, Defendants have not established that the deterioration of the

marijuana was done in bad faith.  As a result, the undersigned **RECOMMENDS** that

Defendants' motions to suppress the marijuana based on its alleged bad-faith

destruction, [Docs. 217, 226], be **DENIED**.  Since the government (and the SSPD)

have complied with the law in seeking destruction of the bulk evidence, the

undersigned **OVERRULES** Defendant's objections to the destruction of the excess

AO 72A
(Rev.8/8
2)

material, and also **RECOMMENDS** that the government's motion seeking permission to destroy the bulk marijuana evidence, [Doc. 188], be **GRANTED**.

## IV.    Conclusion

For all the above reasons, the undersigned **RECOMMENDS** that

(1) the motion to suppress evidence by Sarah Townsend, [Doc. 171], be **DENIED**;

(2) motion for return of property (vehicle) by Sarah Townsend, [Doc. 172], be **DENIED**;

(3) the joint amended motion to suppress statements and searches by Sarah Townsend and Phillip Laughlin, [Doc. 178], be **DENIED**;

(4) the motions to suppress evidence improperly allowed to deteriorate by Sarah Townsend and Phillip Laughlin, [Doc. 217, 226], be **DENIED**; and

(5) the motion to allow Sandy Springs Police Department to destroy bulk marijuana by the United States, [Doc. 188], be **GRANTED**.

I have now ruled on all pretrial motions that have been referred to me from the District Judge. (Two motions, Docs. 106 and 122, were not referred to the undersigned. Also, Townsend's supplemental motion for bond, [Doc. 176], is beyond the authority of the undersigned to consider. *United States v. Torres*, 86 F.3d 1029 (11th Cir. 1996) (holding that where detention was ordered or bond was set in another district by a

AO 72A
(Rev.8/8
2)

magistrate judge, an appeal in the district of offense is to the district judge with jurisdiction over the offense, not the duty magistrate judge).) The undersigned has not been advised of any problems hindering the scheduling of trial. Therefore, the case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED AND CERTIFIED**, this the __6th__ day of July, 2012.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)